571 F.2d 1025
 3 Media L. Rep. 1817
 MIDWEST VIDEO CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Companies, Inc., et al., Intervenors.
AMERICAN CIVIL LIBERTIES UNION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Companies, Inc., et al., Intervenors.
 Nos. 76-1496 and 76-1839.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1977.
Decided Feb. 21, 1978.
 
 George H. Shapiro, Washington, D. C., for petitioner, Midwest Video Corp.; Wayne W. Owen and Harry E. McDermott, Jr., Moses, McClellan, Arnold, Owen & McDermott, Little Rock, Ark., and Harry M. Plotkin and Mary Candace Fowler, Arent, Fox, Kintner, Plotkin, Kahn, Washington, D. C., on brief.
 Michael Botein, Rutgers Law School, Newark, N. J., for petitioner, American Civil Liberties Union; Joel M. Gora, American Civil Liberties Union, New York City, on brief.
 Julian R. Rush, Jr., Counsel, F. C. C., Washington, D. C., for respondent, F. C. C.
 James F. Ponsoldt, Atty., Dept. of Justice, Washington, D. C., for respondent, United States.
 John H. Shenefield, Acting Asst. Atty. Gen., Carl D. Lawson and James F. Ponsoldt, Attys., Dept. of Justice, Washington, D. C., and Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Julian R. Rush, Jr., Counsel, F. C. C., Washington, D. C., on brief for respondents.
 
 
 1
 Charles M. Firestone, Citizens Communications Center, Washington, D. C., for intervenors, Natl. Black Media Coalition, et al.; Susan Dillon, Legal Intern, and Christopher Ma, Legal Intern, on brief.
 
 
 2
 John H. Midlen and Dennis F. Begley of Midlen & Reddy, Washington, D. C., on brief for intervenors, Coldwater Cablevision Inc. and Michigan CA-TV Co.
 
 
 3
 Stuart F. Feldstein, Frederick W. Finn and Arthur H. Harding, National Cable Television Assn., Inc., Washington, D. C., on brief amicus curiae for National Cable Television Assn., Inc.
 
 
 4
 Barry P. Simon, Teleprompter Corp., New York City, and Jay E. Ricks, Robert R. Bruce and Gardner F. Gillespie, Washington, D. C., on brief for Teleprompter Corp., amicus curiae in support of petitioner, Midwest Video Corp.
 
 
 5
 Before STEPHENSON and WEBSTER, Circuit Judges, and MARKEY, Chief Judge.*
 
 
 6
 MARKEY, Chief Judge.
 
 
 7
 Petitioners, Midwest Video Corporation (Midwest) and the American Civil Liberties Union (ACLU), seek review of the Federal Communications Commission's (Commission's) Report and Order in Docket No. 20508, 59 F.C.C.2d 294 (released May 13, 1976), reconsideration denied, 62 F.C.C.2d 399 (released December 21, 1976) (1976 Report )[1] imposing mandatory access and channel capacity requirements upon certain cable television systems.[2]
 
 
 8
 Midwest challenges the regulations as (1) inadequately supported by the record, (2) beyond the jurisdiction of the Commission, (3) violative of the free speech clause of the First Amendment, and (4) violative of the due process clause of the Fifth Amendment.
 
 
 9
 ACLU does not challenge the Commission's jurisdiction to issue the 1976 Report regulations, but objects to the softening modifications made to the 1972 Cable Report access rules,[3] alleging that the modifications (a) lack rational basis in their failure to consider interests of access program producers, (b) violate the Commission's mandate to regulate cable television as a common carrier, and (c) do not fully achieve general First Amendment goals.[4]
 
 
 10
 We grant the petition for review and set aside the order because it exceeds the jurisdiction of the Commission.
 
 Background
 
 11
 As the cable television industry sought to develop over the past twenty-five years, the Commission's effort to regulate it has led to numerous Commission proceedings, voluminous litigation, and substantial literature.[5]
 
 
 12
 A cable system is composed of an antenna, to pick up local and distant broadcast signals, and cables for transmitting those signals to the home television sets of the system's paying subscribers. Some systems have employed the services of microwave companies for long distances between their antennae. The cable system may also transmit its own programs, i. e., "cablecast," through its cables to its subscribers. For technical reasons, most cable systems began with 12 channels.[6]
 
 
 13
 Having decided to preserve the "national television service" as it existed in 1952, Sixth Report and Order on Rules Governing Television Broadcast Stations, 17 Fed.Reg. 3905 (1952), the Commission initially ignored cable television, considering it no threat to broadcasting or to its regulatory domain. On receipt of broadcaster complaints in 1958, the Commission ruled that cable systems were not common carriers and refused to regulate them. Frontier Broadcasting Co., 24 F.C.C. 251, 253-54 (1968), aff'd, Report and Order on Inquiry Into the Impact of Community Antenna Systems, Television Translators, Television "Satellite" Stations, and Television "Repeaters" on the Orderly Development of Television Broadcasting, 26 F.C.C. 403, 441 (1959). The Commission's position that cable systems were not engaged in common carrier operations was upheld in WSTV, Inc., 23 Rad.Reg. P 184 (1962) and in Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966). In all this, the Commission decided that it had no jurisdiction over cable television as common carriers under Title II of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 et seq. (1970) (Act), or as broadcasters under Title III of the Act, and that it had no plenary power to regulate an industry just because that industry may have an impact on broadcasting, over which it did have jurisdiction.[7]
 
 
 14
 Becoming persuaded, and announcing with admirable candor, that cable systems might represent a competitive threat to its regulatees in television broadcasting, the Commission decided to assert jurisdiction.[8] The Commission's approach to Congress for appropriate statutory authority was frustrated. To date, the Congress has refrained from exercising its legislative authority to provide that the Commission shall or shall not regulate cable systems, and, if they shall, in what manner and to what purpose and extent. The subject of cable regulations has thus been left substantially entirely to the Commission and the Courts.[9]
 
 
 15
 Proceeding on its own, the Commission has attempted not just to keep pace, but to anticipate the course of communications advances, facing the virtually impossible task of outrunning our modern technological juggernaut. Beginning with indirect regulation through its jurisdiction over microwave companies used by some cable systems, and exhibiting an apparent hostility toward letting cable grow as its own ingenuity and consumer acceptance may have dictated, the Commission imposed an extended "freeze" on cable's growth, see Wentronics, Inc. v. FCC, 118 U.S.App.D.C. 36, 331 F.2d 782 (1964).
 
 
 16
 The Commission has since attempted to frame a place for cable television while preserving broadcast television intact. The effort has resulted in the establishment of a Cable Television Bureau under the Commission, and 60 pages of cable regulations at 47 C.F.R. §§ 76.1-78.115 (1976).[10] As a substitute for the license it is statutorily empowered to grant or refuse to broadcasters, the Commission issues a "Certificate of Compliance," for cable operators. 47 C.F.R. § 76.11. It sets for state and local franchising authorities the conditions they may impose on cable enterprises seeking a franchise to string cable underground or on poles. 47 C.F.R. § 76.31. It requires cable operators to submit forms and reports. 47 C.F.R. §§ 76.401-411.
 
 
 17
 Much of the Commission's cable-regulating has involved the planting of new and dramatic seeds of regulation, based on soaring, euphoric predictions (some from cable owners) of great things to come from cable television, seeds which had to be plowed under, when germination failed in the bright sunlight of commercial, economic, and technological reality.[11]
 
 
 18
 The Commission's jurisdiction over cable retransmission of distant (Los Angeles) broadcast television signals into a local (San Diego) broadcast station's "contour" was upheld as "reasonably ancillary" to its regulatory responsibilities for broadcast television in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). In the following year, the Commission adopted a "mandatory origination" rule, requiring cable systems with over 3499 subscribers to originate some programs of their own. First Report and Order in Docket No. 18397, 20 F.C.C. 201, 202-04 (1969). This court set that rule aside as beyond the Commission's jurisdiction. Midwest Video Corp. v. United States, 441 F.2d 1322 (8th Cir. 1971). In a split decision, the Supreme Court reversed, sustaining the mandatory origination rule as also "reasonably ancillary" to the Commission's responsibilities for broadcast television. United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972).[12]
 
 
 19
 Having carried the fight to victory in the Supreme Court, the Commission never enforced its mandatory origination rule.[13] Instead, it conducted new proceedings, leading to the 1972 Cable Report, imposing "mandatory access" rules, under which cable systems in the largest 100 markets, were required, inter alia, to build a 20-channel capacity, to reserve three "access" channels for free use by public, educational, and governmental bodies, and to reserve a fourth channel for leased access. 36 F.C.C.2d at 240-41. All access was to be on a first come, nondiscriminatory basis, with no control by cable operators over program content. A compliance deadline of March 31, 1977 was set.[14]
 
 
 20
 In 1974, the Commission formally rescinded the mandatory origination rule, 39 Fed.Reg. 43302, and simultaneously issued rules on equipment availability, Report and Order in Docket No. 19988, 49 F.C.C.2d 1090 (1974), requiring cable systems with over 3499 subscribers to purchase, and make available to the public, equipment for producing local programs and cable time for their presentation. Midwest petitioned this court for review but withdrew its petition as moot in view of the challenge here to the 1976 Report, which merged the equipment availability and mandatory access rules. Midwest Video Corp. v. FCC, No. 75-1671, dismissed on petitioner's motion (8th Cir. April 12, 1976).
 
 
 21
 In March, 1974, the Commission appointed task forces to investigate the effect of the 1972 Cable Report rules. In responding to the task forces' report, the Commission invited comment on postponement of the March 31, 1977 deadline, Notice of Proposed Rulemaking in Docket No. 20363, FCC 75-211, 51 F.C.C.2d 519 (Released Feb. 26, 1975), and acknowledged concerns of various parties that: (1) industry revenues were insufficient to create new plants, distribution networks, amplifiers, converters, and modulators; (2) more time was needed to build revenue; (3) the poor economy and large debt of most cable systems meant they were unable to borrow for non-revenue producing activities; and (4) the Commission was unreasonable in expecting financial interests to provide capital while it required franchise authorities to enforce access and equipment rules, a process entailing the cable system's very authority to operate. The Commission received estimates that the cost of rebuilding to meet the 1972 rules was between $133 million and $430 million.
 
 
 22
 In its Notice of Proposed Rulemaking in Docket No. 20508, 53 F.C.C.2d 782, 784 (Released June 27, 1975), the Commission added to deadline postponement consideration of alternative methods by which "we might reaffirm our commitment to access cablecasting while recognizing the economic realities of today's marketplace." It noted the substantial cost of technological changes required by its 1972 access rules and great variances in the burden on different cable systems.
 
 
 23
 In its Notice in Docket No. 20508, supra, the Commission rejected all suggestions that it require construction of channel capacity and provision of access only upon indication of community demand for such services. The suggesters felt that in many communities the channels and equipment would go unused, yet the cost would be borne by cable consumers ("subscribers") totally uninterested in viewing access programs. The Commission said, "(W) hile we may consider this approach at some point in the future, we do not believe for the following reasons that the general adoption of an approach strictly tied to demand would at this time be wise."[15] The Commission listed ten "reasons": (1) cable television is new and evolving; (2) availability[16] of cable channels for dissemination of information is even newer; (3) demand for access services is a function of community awareness of their existence; (4) awareness and full utilization of cable's potential requires time; (5) some older systems have provided minimal access on a voluntary basis or no access; (6) in those communities awareness has not had opportunity or time to develop; (7) if its requirements resulted in blank channels, it believed that would shorten the time to realize the full potential for access services, because blank channels are visible and continuing inducements to be filled; (8) it considered that true for the channel user and the system operator; (9) if it required the system operator to provide access channels, he could be expected to encourage their use; (10) if it now altered its rules to reflect existing demand for access services, it would raise a barrier to growth of that demand and a disincentive to new services "we expect of cable." 53 F.C.C.2d at 787, 788.
 
 
 24
 Though the Commission said "There is mounting evidence that access cablecasting in an increasing number of communities is beginning to fill that need," Commissioner Robinson stated, "If the Commission has such evidence they have kept it remarkably well hidden from me." 53 F.C.C.2d at 801.
 
 
 25
 Commissioner Quello suggested deference to local franchise authorities, who might require one access channel "upon demand and need therefore," and called on the Commission to obtain "practical, statistical data on current uses of cable facilities" and to project the future based "on statistical data rather than 'blue sky' expectations as in the past," saying, "In short, I think the Commission has burdened the cable industry unnecessarily with requirements and restrictions which cannot be statistically or practically supported." 53 F.C.C.2d at 799.
 
 
 26
 On May 13, 1976, having invited and received comments, the Commission released its Report and Order in Docket 20508, the 1976 Report here under review.
 
 
 27
 The 1976 Report rescinded earlier requirements based on assumptions admittedly proven false, and made three major changes in the 1972 mandatory[17] access rules. First, it applied them to all cable systems with over 3499 subscribers, eliminating the top 100 markets criteria. 59 F.C.C.2d at 303-06; 47 C.F.R. § 76.252-56 (1976). Second, it extended the March 31, 1977, deadline for compliance with the 20-channel construction requirement to June 21, 1986, for most, but not all, existing systems. 59 F.C.C.2d at 321-24; 47 C.F.R. § 76.252(b) (1976).[18] Third, it required four access channels only of systems having sufficient capacity and demand for full time access, requiring other systems to conglomerate access on one or more channels. 59 F.C.C.2d at 314-16; 47 C.F.R. § 76.254 (1976).
 
 
 28
 Thus an evolutionary process has led to the Commission action under review, the 1976 Report, which provides:
 
 
 29
 (1) that operators of cable systems having 3500 or more subscribers designate at least four channels for access users, one channel each for public access, education access, local government access, and leased access. 47 C.F.R. § 76.254(a).
 
 
 30
 (2) that, until demand exists for full time use of all four access channels, access programming may be combined on one or more channels. 47 C.F.R. § 76.254(b).
 
 
 31
 (3) that at least one full channel for shared access be provided, but if a system had insufficient activated channel capacity on June 21, 1976, it could provide whatever portions of channels are available for such purposes. 47 C.F.R. § 76.254(c).
 
 
 32
 (4) that at least one public access channel be forever supplied without charge. 47 C.F.R. § 76.256(c)(2).
 
 
 33
 (5) that a reasonable charge for production costs may be charged for live studio programs longer than five minutes. 47 C.F.R. § 76.256(c)(3).
 
 
 34
 (6) that operators establish rules providing for access on a first-come, nondiscriminatory basis and prohibiting the transmission of lottery information, obscene or indecent matter, and commercial and political advertising. 47 C.F.R. § 76.256(d)(1) (on public channel). 47 C.F.R. § 76.256(d)(2) (on educational channel).[19]
 
 
 35
 (7) that cable operators exercise no other control over content of access programs. 47 C.F.R. § 76.256(b).
 
 
 36
 (8) that educational and local government access be offered without charge for the first five years. 47 C.F.R. § 76.256(c)(1).
 
 
 37
 (9) that operators establish rules for leased access channels on a first-come, nondiscriminatory basis, requiring sponsorship identification and an appropriate rate schedule, with no control over program content except to prohibit lottery information and obscene or indecent material. 47 C.F.R. § 76.256(d)(3).
 
 
 38
 (10) that each cable supply equipment and facilities for local production and presentation of access and lease programs. 47 C.F.R. § 76.256(a).[20]
 
 
 39
 (11) that equipment in new cable systems have a capacity of two-way, nonvoice communication and a minimum of 20 channels. 47 C.F.R. § 76.252(a).[21]
 
 
 40
 (12) that cable systems in operation within a major television market before March 31, 1972, and other systems in operation before March 31, 1977, shall have ten years from the effective date (June 21, 1976) of the 1976 Report to comply. 47 C.F.R. § 76.252(b).
 
 Issue
 
 41
 The dispositive issue is whether the regulations promulgated in the 1976 Report exceed the Commission's jurisdiction.[22]
 
 OPINION
 I Jurisdiction
 
 42
 The mandatory access, channel capacity, and equipment regulations of the 1976 Report exceed the Commission's jurisdiction because: (1) the statute provides no jurisdiction; (2) the regulations are not "reasonably ancillary" to the Commission's responsibilities for regulation of broadcast television; (3) objectives do not confer jurisdiction; (4) the Commission's ends do not justify its means; (5) the means are forbidden within the Commission's statutory jurisdiction.
 
 
 43
 (1) The Statute and the Commission's Jurisdiction Over Cable Television
 
 
 44
 The Commission's charter, its basic grant of power to regulate, is the Communications Act of 1934, as amended, 47 U.S.C. § 151 et seq. (1970) (Act), in which Congress delegated regulatory authority over (1) common carriers of communications by wire or radio, Title II, 47 U.S.C. §§ 201-21 (1970), and (2) broadcasters using channels of radio transmission, Title III, 47 U.S.C. §§ 301-29 (1970). Because § 3(b) includes "transmission by radio of * * * pictures * * *," 47 U.S.C. § 153(b) (1970), the Act encompasses broadcast television. Cable systems, first developed in the 1950's, are neither common carriers nor broadcasters.[23] Hence the Act contains no specific grant of authority over cable systems, and there can have been no Congressional intent regarding them.
 
 
 45
 Whether the Commission and the courts should relieve Congress of the need to revise statutes in the light of new technology, General Telephone Co. of Cal. v. FCC, 134 U.S.App.D.C. 116, 413 F.2d 390 (1969), cert. denied, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969),[24] neither the nonexistence of cable technology in 1934, nor Congressional abstention over the past quarter century, need be considered the sole reason for the present absence of specific, plenary statutory power to regulate the industry called "Cable Television." Neither the basic rationale for regulation of common carriers (to insure fair and equal access to the carrier's service) nor that for regulation of broadcast transmissions (to preclude bedlam on broadcast frequencies), is applicable to cable systems per se.
 
 
 46
 Congressional silence does not, however, end the inquiry in every case. Though a statutory void cannot itself create jurisdiction in an agency, and though neither agencies nor courts receive the legislative powers not exercised by the Congress, the rapid growth of communications technology requires a unified system of regulation, and sufficient flexibility and breadth of mandate to permit an agency, confronted with new technology not covered by statute but having serious impact on technology that is, to adopt such regulations as will enable the agency to protect the public interest.[25]
 
 
 47
 In GTE Service Corp. v. FCC, 474 F.2d 724 (2d Cir. 1973), the court held that statutory silence did not preclude regulation of the interaction of data processors and common carriers, while denying Commission authority to regulate data processors themselves. And there lies the rub. Regulation to protect the public's vested interest in an established service, against injury from interaction of new technology, is one thing. It is quite another when an agency steps beyond its authority. The former may well be in the public interest. The latter never is.[26]
 
 
 48
 Respecting the Commission's jurisdiction over cable systems, the Supreme Court has supplied a measure. Under that guidance, the statute is to be given a broad, not restrictive, interpretation. Further, because we are not super-Commissioners, our inexpert view of the wisdom of the regulations under review is not to be substituted for the experience and expertise of the Commission. To shy, however, on those grounds from determination of the legal question touching the Commission's jurisdiction, would be a denial of effective judicial review of regulatory actions "not in accordance with law," 5 U.S.C. § 706(2) (A) (1970), and an exercise in judicial abdication. The statute having provided no express basis for jurisdiction, we determine the jurisdictional issue in accord with the "reasonably ancillary" standard expressed in Southwestern, supra, and Midwest Video, supra.
 
 
 49
 (2) The "Reasonably Ancillary" Standard
 
 
 50
 Because the Supreme Court sustained its authority to promulgate the rules in Southwestern and Midwest Video, the Commission says those two cases establish a jurisdiction over cable systems so broad as to authorize the 1976 Report mandatory access, channel construction, and equipment availability regulations. We disagree.
 
 
 51
 The jurisdiction found in Southwestern was sufficient to encompass prohibition of importation by cable systems of distant broadcast signals into the top 100 markets without a Commission finding of consistency with the public interest. 392 U.S. at 166-67, 88 S.Ct. 1994.[27] The Commission's concern was that availability of Los Angeles programs in San Diego would fragment the audience of the local conventional television station, risking loss of advertising revenues and curtailment or termination of the local station's service to the public. Petitioner argued that the Commission had no jurisdiction whatever over cable systems. Citing broad purposes in § 1 of Title I, 47 U.S.C. § 151, the Court described the Commission's authority over cable television as restricted to that "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." 392 U.S. at 178, 88 S.Ct. at 2005.
 
 
 52
 The rule at issue in Midwest Video, requiring cable systems to originate programs, was also held "reasonably ancillary" to the Commission's responsibilities for broadcast television. Noting that " § 2(a) does not in and of itself prescribe any objectives for which the Commission's regulatory power over CATV (cable television) might properly be exercised," 406 U.S. at 661, 92 S.Ct. at 1867, the plurality found such objectives in the broad policy statements of §§ 1 and 303(g)[28] of the Act. The four dissenting justices said the upshot of the plurality's holding was "to make the Commission's authority over activities 'ancillary' to its responsibilities greater than its authority over any broadcast licensee." 406 U.S. at 681, 92 S.Ct. at 1877. The Chief Justice, concurring in the result, concluded that until Congress acts, the Commission should be allowed wide latitude, but also stated:
 
 
 53
 Candor requires acknowledgement, for me at least, that the Commission's position strains the outer limits of even the open-ended and pervasive jurisdiction that has evolved by decisions of the Commission and the courts. (406 U.S. at 676, 92 S.Ct. at 1874.)
 
 
 54
 In our view, the present mandatory access, channel construction, and equipment availability rules burst through the outer limits of the Commission's delegated jurisdiction.[29] The 1976 Report nowhere states, and the Commission nowhere argues, that these rules were created and applied to cable systems to protect a broadcast station's "contour" as in Southwestern ; or to require, as in Midwest, the origination of programs, like broadcasters do; or to govern an activity involving the airwaves; or to protect the growth of broadcast television; or to protect the public interest in continued broadcast television services;[30] or to protect broadcasting against "unfair competition" from cable, or to allow the Commission "to perform with appropriate effectiveness"[31] its responsibilities for broadcast television.
 
 
 55
 The standard established by the Court is "reasonably ancillary," not merely "ancillary." The standard is already broad, and the term "reasonably," requiring some nexus with the Commission's statutory responsibility, must not be read out of it. Nor can there be deleted what the Court said cable actions must be "reasonably ancillary" to, i. e., "the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." 392 U.S. at 178, 88 S.Ct. at 2005 (emphasis added).
 
 
 56
 The Commission has not shown the slightest nexus between its 1976 Report access rules and its responsibilities for broadcast television.
 
 
 57
 Because the free public access concept, on newly constructed, separately designated channels, has nothing to do with retransmission of broadcast signals on existing channels, the relationship or interaction between cable and broadcast systems present in Southwestern and in Midwest Video is totally absent here. The present rules are not designed to govern some deleterious interrelationship of cable systems to broadcasting, or to require that cable systems do what broadcasters do, but relate to cable systems alone, and are designed to force them into activities not engaged in or sought; activities having no bearing, adverse or otherwise, on the health and welfare of broadcasting.[32]
 
 
 58
 Though neither Southwestern nor Midwest Video supports jurisdiction here, it is a "reasonably ancillary" standard we apply, and it is the 1976 Report rules we review. Each regulation of cable television must individually stand or fall, not on legal precedent concerning other regulations, but on whether or not the regulation under the review meets the standard established by the Court.[33] The Commission reliance on Southwestern and Midwest Video ignores the indications in those cases that it has no sweeping jurisdiction over cable television, that whatever jurisdiction it may have is contingent upon its delegated powers, and that each attempt to regulate cable systems must be individually justified. Nat'l Ass'n of Reg. Util. Comm'rs v. FCC, 174 U.S.App.D.C. 374, 385, 533 F.2d 601, 612 (1976).
 
 
 59
 Thus the Commission argues that the Court's approval of the mandatory origination rule in Midwest Video constituted effective approval of the present construction and access rules. The contention is disingenuous. The Court was aware that one way of satisfying the origination requirement was to cablecast programs "produced by others."[34] But that form of "access" was not the mandatory access required by the present rules. Nor did that form of "access" involve the extensive and expensive construction, and equipment purchase and installation, required by the present rules. Further, the plurality opinion specifically stated that no regulation, proposed or adopted, other than the program origination requirement, was before the Court, and that no views were intimated on the validity of any other regulations. 406 U.S. at 652 n. 4, 92 S.Ct. 1860.
 
 
 60
 The Commission's argument equating its origination rule and the present access rules disregards fundamental differences between them. Under the former, had it been enforced, cable operators would have had discretion and responsibility for program content, could have sought financial support, and would have been forced to act like broadcasters. Under the latter, cable operators can have no discretion or responsibility for program content, may make essentially no charge, and are forced to act like common-carriers.[35]
 
 
 61
 Nothing, therefore, in the plurality's approval of the erstwhile origination rule as "reasonably ancillary" in Midwest Video may serve to bring the entirely distinct mandatory access rules within that standard.
 
 
 62
 To be "reasonably ancillary," the Commission's rules must be reasonably ancillary to something. As discussed below, the Commission has no jurisdiction within its statutory grant, under the broadest view of that grant, to force the present free public access rules upon broadcasters, or to make broadcasters into common carriers. Because, as we shall see, the 1976 Report regulations are an attempt to do just that to cable systems, they can fare no better. The Commission having no power to impose these access rules on either broadcast or cable systems, the 1976 Report regulations cannot be "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting."
 
 
 63
 (3) Objectives
 
 
 64
 (a) Statutory v. Commission Objectives
 
 
 65
 The Commission's fundamental argument, in support of jurisdiction to issue its 1976 Report regulations, is based on "objectives."[36] That view permeates the 1976 Report and the Commission's brief here, the latter stating the issues as (1) whether the rules are a "reasonable exercise of agency authority to promote statutory objectives," in the face of arguments "rejected" in Midwest Video, and (2) whether the constitutional arguments, "also similar to those rejected in Midwest Video," are without merit. Even if a statutory statement of objectives constituted a grant of power, the objectives on which the Commission relies are not those stated in the statute.[37]
 
 
 66
 The statutory objectives stated in § 1 of the Act (not cited as authority in the 1976 Report ) are "to make available, so far as possible, to all the people of the United States a rapid, efficient, nation-wide and world-wide wire and radio communication service * * *." The Commission does not argue that this, or any one of the statutory sections cited as authority in the 1976 Report, see note 25 supra, contains objectives achieved or approached by the present regulations. And well it doesn't. For the Act, however broadly read, contains no objectives so broad as to encompass whatever is necessary to get everybody on television. If that major foray be a legitimate goal, it must be established not by the Commission or the courts, but by Congress.
 
 
 67
 The "objectives," cited and relied on by the Commission in its brief here, are of its own design: "increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services."
 
 
 68
 The Commission draft of objectives in its brief is not the statement submitted to the Supreme Court in Midwest Video, where the full statement read, "to further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services." 406 U.S. at 654, 92 S.Ct. at 1863 (emphasis added). The Commission's brief thus tailors a set of objectives to fit the rules it desires here to sustain. To condone that practice would be to turn judicial review of the regulatory process on its head.[38]
 
 
 69
 If any specific "long established goals in the field of television broadcasting" are here involved, we are not told what they are. In the statement used to persuade the plurality in Midwest Video, "increasing outlets" and "augmenting choices" follow "by," and are thus set forth as actions leading to the broadcasting goals. We are cited to no instance in which "increasing outlets" and "augmenting choices" have themselves been approved as cable jurisdiction-spawning goals.[39] If "increasing outlets" and "augmenting choices" are goals, they cannot be divorced from the context of broadcasting. That context defines and limits the means by which those goals may be sought. Moreover, if the objectives cited in Midwest Video and those cited here had been stated identically, that circumstance would not sustain the present rules. The only possible objectives rules relationship in Midwest Video applied to origination. Because the rules are fundamentally different, relationship to an origination rule provides no support for rules enabling anyone and everyone to "get on" cable television.[40]
 
 
 70
 Doubtless "increasing outlets" and "augmenting choices" are laudable, praiseworthy, and desirable actions. Communication is the life blood of a free society, and "freedom of communication" is virtually synonymous with "freedom of speech" and "freedom of the press." It can be assumed that no agency will act toward objectives perceived as evil, but the world has come to regret many actions taken in the name of attractive euphemisms and appeals to goals beloved by many.
 
 
 71
 "(T)he widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Though those cases did not deal with access-by-all, the quoted principle is unchallengeable. To enliven and enrich the public dialogue is a commendable intent. We are here concerned, however, not with the Commission's psyche, but with its action. The question before us is not the sincerity of the Commission or the glorious nature of its objectives. The sole question is whether compelling cable systems to build and dedicate facilities to essentially free public use was within the Commission's jurisdiction.
 
 
 72
 The Commission calls "increasing outlets" and "augmenting choices" its "regulatory policy," pointing not to the Act but to the only former action appearing to support that policy, i. e., Midwest Video, which dealt with entirely different regulations. Whether we find the "policy" attractive is irrelevant. A court may favor an agency-espoused policy, while condemning the agency's exercise of unauthorized power in a specific action taken in pursuit of that policy. The nobility of a goal or policy cannot justify usurpation, by the Commission or by us, of a power to pursue it in whatever manner we think might "work."
 
 
 73
 The fundamental principle that governmental agencies are limited to the exercise of power delegated by the Congress would be nullified if an agency (like Disraeli, who is said to have preferred the power to write the public's slogans over the power to write its laws) were at liberty to expand its jurisdiction, as far and wide as it wished, by the facile, case-by-case step of re-writing the objectives found in the delegating statute. If "jurisdiction" be synonymous with agency-drafted, ad hoc "objectives," Congress and the courts become essentially superfluous.[41]
 
 
 74
 In its 1976 Report and before us, however, the Commission overrides all concerns, practical, statutory, legal, and constitutional, upon a single analysis, i. e., it is enough that its objectives be good and that its action be reasonably related to them. But the list of good "objectives" conceivable by the numerous regulatory agencies of the federal government, and perhaps achievable if they had carte blanche, is endless. And every act of every agency would be justified, jurisdictionally sound, and judicially approved, if values sought were the sole criterion.[42]
 
 
 75
 The Commission has on other occasions faced the delicate task of softening our troubled edges, when there occurs a restriction of someone's right to speak. Government may have to act to prevent single ownership of all television, radio, and newspaper voices in a community. The Commission's mandatory access, channel capacity, and equipment rules are quite another matter. Here the Commission engages in no protection of the right to speak. On the contrary, it has embarked, with positive commands, on a crusade to create a public right to use cable facilities.
 
 
 76
 True, the Commission acted here with a view toward expanding what it considers the goals of the First Amendment.[43] Every regulatory agency should have all constitutional "goals" and restrictions on government in mind in carrying out its duties (the more so where, as here, the agency is operating outside its statutory jurisdiction), but we deal here with the Federal Communications Commission, not the Federal First Amendment Commission. We are aware of nothing in the Act, and have been cited to no other proper source, which places with the Commission an affirmative duty or power to advance First Amendment goals by its own tour de force, through getting everyone on cable television or otherwise. Rhetoric in praise of objectives cannot confer jurisdiction. If the Commission desires to operate in an area beyond its statutory borderline of jurisdiction, and to direct an industry, at that industry's expense, to provide and police new opportunities to speak, prior Congressional direction appears a minimum requirement.[44] Composing its own statement of "objectives" will not alone provide the required jurisdictional power.[45]
 
 
 77
 (b) Objectives and Retransmission
 
 
 78
 The Commission's brief justifies its zeal for free public access to cable television, as it has most of its cable regulations, on cable's reception and retransmission of broadcast signals, i. e., its "free ride" on broadcast television, for which cable should "pay" by meeting Commission "objectives." In its Cable Report, 36 F.C.C.2d at 190, and in its present brief, the Commission states:
 
 
 79
 Broadcast signals are being used as a basic component in the establishment of cable systems, and it is therefore appropriate that the fundamental goals of a national communications structure be furthered by cable * * *. ([46])
 
 
 80
 To the extent that cable systems must now pay royalties for broadcast programs retransmitted, note 32 supra, the Commission's "free ride" rationale may crumble. Beyond that question, however, the Commission does not "own" broadcast programs, and may not lawfully condition their retransmission on compliance with any and every rule it may devise.
 
 
 81
 In Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), a copyright case concerned with whether cable systems "performed" retransmitted broadcast programs, the Court discussed cable's retransmission activity:
 
 
 82
 Essentially, a CATV (cable television) system no more than enhances the viewer's capacity to receive the broadcaster's signals; it provides a well-located antenna with an efficient connection to the viewer's television set. * * *.
 
 
 83
 The function of CATV systems has little in common with the function of broadcasters. CATV systems do not in fact broadcast or rebroadcast. Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public and carry them by private channels to additional viewers. (392 U.S. at 399-400, 88 S.Ct. at 2089 (footnotes omitted).) ([47])
 
 
 84
 In Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966), then Judge, now Chief Justice Burger said, "(N) either is (a broadcaster) a purely private enterprise like a newspaper or an automobile agency. * * * A broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations." 123 U.S.App.D.C. at 337, 359 F.2d at 1003. A cable system is on this record a private enterprise. No statute requires or authorizes federal franchising of cable systems. In retransmitting broadcast programs, cable systems use no "limited and valuable part," or any other part, of the federal public domain. The Commission nowhere tells us, nor is it readily apparent, why the mere retransmission of broadcast signals makes it "appropriate" that cable be shackled to every Commission notion of what is good for the public or why the mere transmission of broadcast signals makes it "appropriate" that cable be chained (by requiring it and it alone to build, dedicate, and police new and separate facilities for public use) to the Commission's vision of the future.
 
 
 85
 The Commission does not say that the absence of 20 cable channels, and free public access thereto, has in any manner impeded "the fundamental goals of a national communications structure." What the Commission does say is that the cable industry must be regulated to give public access because cable is there, and has a "potential" to build a many-channeled capacity. A fortiori, says the Commission, cable systems must build and dedicate that capacity, to achieve the Commission's "objectives." But nothing whatever in the Act, or anywhere else, gives the Commission the unlimited right to say to any private industry, "We believe we have seen the future, and you must construct it." Because an industry can do something cannot be the sole basis for a federal agency's peace-time jurisdiction to make it do it.
 
 
 86
 (c) Objectives v. Unsupported Visions
 
 
 87
 The regulatory philosophy repeatedly expressed in the 1976 Report is that the imponderable whims of cable consumers cannot be relied upon, but that facilities, if built and offered free, will encourage their own use:[48]
 
 
 88
 Should compliance with our requirements result in the maintenance of blank or partially blank channels, it is our belief that the time required to realize the full potential for access services will be shortened, for these channels are themselves a visible and continuing inducement to be filled. (Notice of Proposed Rulemaking, supra, 53 F.C.C.2d at 787-88.)
 
 
 89
 Building for the future, says the Commission, will enable it to take advantage of cable's "capability," relying thus on a type of trickle-out theory to facilitate its social-engineering effort. The rules under review are thus self-fulfilling: they first compel the creation of excess capacity, and then impose a public access obligation on the ground that the capacity exists.[49] The Commission must have broad discretion "to respond to changes which necessarily emanate from a dynamic industry," General Telephone Co. of Cal. v. FCC, supra, 134 U.S.App.D.C. at 131, 413 F.2d at 405, but the present access rules are not a response to change; they are the creation of change, in the "belief" that what the Commission describes as a "societal good," 1976 Report, 59 F.C.C.2d at 296, will result.
 
 
 90
 Visions of theoreticians are in proper context of great value. To achieve, man must visualize. And regulatory agencies must take into account both the future and the future effects of their regulations as best those effects may be estimated on a proper record. But visions of the future, with their low batting average for accuracy, serve poorly as the sole basis for regulations having the force of law;[50] and prophecies of even the wisest regulator are no substitute for a lawful grant of jurisdiction.
 
 
 91
 Regulations like those before us, profoundly altering the obligations of a private business, requiring a fundamental change in its nature, and imposing costs on its consumer-subscribers, should be based on more than an uncertain trumpet of expectation alone. In enforcing regulations designed by the regulator to make futuristic visions come true, courts must proceed with a care proportional to the risk of delivering thereby into the regulator's hands an awesome power. For that way may lie not just a totally regulated future, unpalatable as that may be to a free people, but a government-designed, government-molded, government-packaged future.
 
 
 92
 The public interest rubric encourages judicial deference to an agency's expertise, not to its prescience. Findings may be presumptively correct. Not so futuristic guesses.
 
 
 93
 Most importantly, jurisdiction is not acquired through visions of Valhalla. An agency can neither create nor lawfully expand its jurisdiction by merely deciding what it thinks the future should be like, finding a private industry that can be restructured to make that future at least possible, and then forcing that restructuring, in the mere hope that if it's there it will be used.
 
 
 94
 The Commission asserts that it has a mandate to meet the always-with-us "need for additional means of community expression," Notice, supra, 53 F.C.C.2d at 790. We need not determine whether the Commission has such mandate. It is enough to hold that, if it does, it cannot pursue it by forcing broadcasters, cable systems, ham radio operators, pay-TV systems, subscription-TV systems, closed-circuit-to theatres systems, data processors, or any other communications industry, to construct facilities and donate them to anyone who walks in.
 
 
 95
 In short, the Commission has not been charged, even impliedly, with a responsibility of "increasing outlets for local expression and augmenting program choices," by mandating massive rebuilding and by attempting to deliver the audience of A over to B, at A 's expense, just and solely because B wants to get an audience,[51] and in total disregard of what the paying audience wants. Whether lodgement of that responsibility in the Commission be good or bad is not for us to say. It has not occurred.
 
 
 96
 (d) Objectives and the Public Interest
 
 
 97
 Jurisdiction having been found wanting, we discuss the public interest parameters in response to the Commission's insistence that its public interest objectives authorize its access rules. We do not decide a public interest question, other than to hold that the public interest is not served by agency actions beyond their jurisdiction. See National Broadcasting Co. v. United States, 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).
 
 
 98
 The Commission founded its access rules on its belief that the "public interest can be significantly advanced by opening of cable channels for use by the public and other specified users who would otherwise not likely have access to television audiences," 1976 Report, 59 F.C.C.2d at 296, and refused to be deterred by evidence indicating little likelihood of anyone ever watching access programs. The cable consumer was thus made hostage to the Commission's faith that the equipment he was forced to buy would be used.[52]
 
 
 99
 The Commission referred to a "need" for access services, but refused to undertake a search for evidence of that need, recommended by two Commissioners. Notice, supra, 53 F.C.C.2d at 799-801. Absent evidence that the public is or may be interested in listening, the mere belief that the public interest lies in forcing cable operators to build and deliver to each citizen an electronic soapbox would appear entirely conclusory. As did the public interest in mandating origination, p. 1059 infra, it may also prove illusory.[53]
 
 
 100
 In insisting that channels be built, so their blankness will be "an inducement to be filled," the Commission made no reference to the consumer, but stated, "This consideration is true both for the potential channel user as well as the cable operator * * *." 53 F.C.C.2d at 788. But, as with the tango, communication takes two. Speaker minus listener equals zero. The 1976 Report is concerned with access by the public, not with access to the public.
 
 
 101
 Absent evidence that there is, or is likely to be, a substantial national demand by "users who would otherwise not likely have access to television audiences," and whether there is, or is likely to be, any demand at all for viewing by consumers, who would have to pay for access equipment (even if no access programs are produced; or no viewers ever watch), the Commission's argument that its objectives require a public interest conclusion that cable systems must be rebuilt, and mandatory access provided, is seriously undermined.[54]
 
 
 102
 It would appear that satisfaction of the Commission's desire to advance First Amendment interests in increased communication via its access concept can actually be assured only (1) by an Orwellian requirement that users must produce and cable consumers must watch access programs,[55] or (2) by a cable system's provision of access programs in response to its subscribers' desire to view them. If, in broadcasting where viewing is free, "the interest of the viewer is paramount," Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1972) (CBS); Red Lion Broadcasting, supra, it would appear more so in cable systems, where subscribers must pay.
 
 
 103
 A public interest question may be stated as: Who decides whether cable consumers shall pay millions for equipment to enable access programs? The Commission, or the consumer? Nothing of record reflects a public interest in denying consumers that choice, or in forcing consumers to buy what they may refuse to purchase voluntarily. Certainly a merely conjectural connection between mandatory access and likelihood of its increasing true local communication, even if jurisdictionally permissible, would caution us, were we deciding where the public interest lay, against concluding that the public interest would be harmed if the choice remained with the consumer.[56]
 
 
 104
 Given the general desirability of the Commission's objectives, we find no basis, in the record made, for concluding that those objectives render the access rules before us "reasonably ancillary" to the Commission's responsibilities for regulation of broadcast television, or that those objectives confer upon the Commission a jurisdiction broad enough to encompass the present access rules.
 
 
 105
 (4) Ends v. Means
 
 
 106
 To countenance regulation without at least implied authorization of the people's representatives, because the purpose be benign, is to adopt the view that "the end justifies the means" and stop there. But in government as in life, a good end does not justify any and every means. As above indicated, origination and mandatory access are very different means indeed, and, as discussed below, the Commission is statutorily prohibited from enforcing its present mandatory access rules within its statutory jurisdiction over broadcasters.
 
 
 107
 It is not jurisdictionally so that means are immaterial, so long as broadly encompassing "objectives" can be restated from the purpose statement in § 1, or from the powers and duties statement in § 303(g), of the Act. Referring to Southwestern and Midwest Video, the D.C. Circuit has stated:
 
 
 108
 That these cases establish an outer boundary to the Commission's authority we have no doubt . . . and if judicial review is to be effective in keeping the Commission within that boundary, we think the Commission must either demonstrate specific support for its actions in the language of the Communications Act or at least be able to ground them in a well-understood and consistently held policy developed in the Commission's regulation of broadcast television. (Home Box Office, Inc. v. FCC, supra note 29, at 28.)
 
 
 109
 A "well-understood and consistently held policy developed in the Commission's regulation of broadcast television" includes regulatory means as well as regulatory goals. In Home Box Office, after noting that the Commission was without authority to control the program content of broadcast television in the manner sought under the anti-siphoning rules there at issue, the court said:
 
 
 110
 Moreover, given the similarities between cable-casting operations and broadcasting, we seriously doubt that the Communications Act could be construed to give the Commission "regulatory tools" over cable-casting that it did not have over broadcasting. * * * Thus, even if the siphoning rules might in some sense increase the public good, this consideration alone cannot justify the Commission's regulations. (Home Box Office, Inc. v. FCC, supra note 29, at 31.) ([57])In Home Box Office, the Commission was employing means not available in broadcast regulation to control cablecasting activities already underway. Its present effort to employ means not available in broadcast regulation is even further beyond its jurisdiction, for here the Commission is attempting to compel the initiation of particular (access) cablecasting activities. It is at best anomalous to assert that broadcasting objectives are furthered by use of regulatory tools not lawfully useable to regulate broadcasting.[58] As we have said, regulatory action cannot be "reasonably ancillary" to nothing.
 
 
 111
 We need not determine what distinctions the Commission may draw between broadcasting and cable systems. It is sufficient to hold that, in making any such distinction, the Commission may not exceed its jurisdiction. However attractively the Commission's objectives are interpreted, reinterpreted, or re-packaged, regulatory actions forbidden as means to achieve them within its statutory jurisdiction cannot be considered "reasonably ancillary" to that jurisdiction.[59]
 
 
 112
 (5) The Means Are Forbidden Within
 
 The Commission's Statutory Jurisdiction
 
 113
 (a) Forced Access
 
 
 114
 Counsel for the Commission admitted at oral argument that the mandatory access rules here at issue could not be enforced upon broadcasters. Though counsel said the reason lay in scarcity of broadcast frequencies, it appears to have escaped Commission attention that it is the scarcity of broadcast signals that excuses its limited regulatory intrusion on First Amendment and other rights of broadcasters. The Commission's notion that the absence of scarcity in the potential number of cables removes the limits on its authority has things backward. The absence of scarcity removes the excuse for intrusion.
 
 
 115
 The reasons why access-to-cable cannot be justified as related to the broadcast milieu are fundamental and pervasive. First, as indicated throughout this opinion, many impedimenta to enforcement of mandatory access have nothing to do with scarcity of broadcast frequencies. Second, the Commission's breadth of regulatory power over "semi-public" broadcasters, though limited, is expressly statutory and greater, not less, than any ancillary power it may have over private media, like cable systems. See National Broadcasting Co. v. United States, supra, at 216-219, 63 S.Ct. 997 (1943). Third, the Commission's confirmed policy is that no private individual or group has a right to use broadcast frequencies, and it has recognized that action contrary to that policy is beyond its jurisdiction.
 
 
 116
 If there be a relation between public access and the Commission's "long established regulatory goals in the field of television broadcasting," it escapes detection in the Commission's actions within its jurisdiction. The Commission firmly rejected an opportunity to move even partially toward those goals, as it here interprets them, when it was requested to force paid and limited, not free and fullblown, access on broadcasters. Its resistance was sustained by the Supreme Court, which established that no person has a constitutional right of access to broadcast television. CBS, supra.[60]
 
 
 117
 Indeed, if there be a "public interest" in achievement of the Commission's "long established goals" through access, the Commission has not attempted to serve that public interest by requiring broadcasters, who reach the vast majority of television viewers and are clearly within its jurisdiction, to give (or even sell), even limited time to the public on a first come, nondiscriminatory basis; nor does the Commission deny broadcasters the right to control the material going out over their facilities.
 
 
 118
 This court will not interpret the Commission's "long established goals" one way when the Commission is operating near the ancillary fringes of its statutory jurisdiction, and another way when it is operating clearly within its statutory jurisdiction; nor can we believe that the Commission's "long established goals," interpreted by the Commission as authorizing public access, are legitimate when applied to cable systems and illegitimate when applied to broadcasters.
 
 
 119
 Still, at the very time the Commission was telling us that only practicality impeded its full authority to force the present free public access rules upon broadcasters, it refused even to inquire into the need for broadcasters to give even a little time (petitioners sought 90 seconds out of every 7,200 seconds) to Public Service Announcements (PSAs), and to adopt rules enabling citizen groups, minority spokesmen, and in general the same access-seekers involved here, to have their announcements aired. Petition to Institute a Notice of Inquiry and Proposed Rule Making on the Airing of Public Service Announcements by Broadcast Licensees, FCC 77-685 (Released Oct. 13, 1977). The petitioners' "objectives" were paraphrases of those relied on here by the Commission, i. e., an increase in "diversification" of "programming," community service, meeting local needs, favoring "those citizen groups whose voices typically have not been heard on the broadcast media," and providing "needed assistance to citizen groups in communicating their programs to the public." Petitioners also asked that broadcasters make facilities and technical assistance available.
 
 
 120
 Broadcasters argued, in Petition, supra, that the "proposed rules would be an impermissible intrusion into (their) programming prerogatives," that "requiring a broadcaster to air a particular type of program matter constitutes censorship," that providing technical assistance would be a "heavy burden" on small staffs, and that giving "special access to certain groups" was contrary to "the Commission's policy that no private individual or group has a right to the use of broadcast facilities." In its decision denying an inquiry, the Commission stated:
 
 
 121
 After considering these arguments we believe that even if the First Amendment and Section 326 of the Communications Act are not an absolute barrier, adoption of the instant proposal would be an inappropriate intrusion into the sensitive area of programming. For this reason and because of the licensee's knowledge of his community, he is accorded broad discretion in programming matters, including the scheduling and selection of PSAs.
 
 
 122
 * * * As to providing a preference for citizen group announcements, we note that no private individual or group has a right of special access to the airwaves. (Petition, supra, at 4, 6) ([61])
 
 
 123
 Again, in a recent proceeding, Changes in the Entertainment Formats of Broadcast Stations, Notice of Inquiry, 57 F.C.C.2d 580 (1976), Memorandum Opinion and Order, 60 F.C.C.2d 858 (1976), the Commission concluded that it lacked authority to regulate broadcast program formats, because that action is analogous to imposing common carrier responsibilities on broadcasters and is thus prohibited by Section 3 of the Act, 60 F.C.C.2d at 859; and because "(i)t is impossible to determine whether consumers would be better off (with a particular format) without reference to the actual preferences of real people." Id. at 864. The Commission's 1976 Report attempts to impose a "public forum" format on cable systems, and, as discussed below, it does impose common carrier responsibilities, and it totally ignores the preferences of cable consumers, who are "real people."
 
 
 124
 Thus the Commission exceeded its own recognized jurisdictional limitations in the field of television broadcasting, when it attempted to impose its 1976 Report mandatory access, channel construction and equipment rules on cable systems.[62] The Commission does not in truth rely here on any "reasonably ancillary" jurisdiction. The jurisdictional genesis for the present access rules is not even allegedly lurking in the lacuna of the Act.[63] It arises not from a power over broadcasting but from a Commission act of creation. Creation, however, is a function of the Almighty, and in the creation of jurisdictional authority, the almighty is Congress, not the Commission.
 
 
 125
 (b) Common Carrier
 
 
 126
 Section 3(h) of the Act, 47 U.S.C. § 153(h), provides that "a person engaged in radio broadcasting shall not * * * be deemed a common carrier." In National Association of Regulatory Utility Commissioners v. FCC,173 U.S.App.D.C. 413, 424, 525 F.2d 630, 641 (1976), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976), and in National Association of Regulatory Utility Commissioners v. FCC, 174 U.S.App.D.C. 374, 381-82, 533 F.2d 601, 608-09 (1976), the court defined the two prerequisites of communications common carriage: (1) provision of service to users indiscriminately; and (2) transmission of intelligence of the user's own design and choosing. The 1976 Report mandatory access rules require: (1) provision of cable service to users indiscriminately; and (2) transmission of intelligence of the user's own design and choosing. Thus the 1976 Report imposes common carrier responsibilities on cable systems, and the attempt to bludgeon cable systems into becoming common carriers is an exercise specifically forbidden the Commission within its delegated powers. It is no more jurisdictionally sound than the same action would be if exerted against broadcasters.[64]
 
 
 127
 The 1976 Report creates a dilemma and impales itself on the horns. The regulations require that a cable system cablecast access users' programs. If the Commission's equation of "cablecast" to "broadcast" be made, the cable system, as broadcaster, cannot have the Commission's common carrier type access rules enforced upon it without violation of the Act.[65]
 
 
 128
 There can be no question that the 1976 Report mandatory access rules are an attempt to convert cable systems into common carriers with respect to their bandwidths not used to retransmit broadcast signals. In the parent Cable Report, the Commission emphasized that it contemplated "a multipurpose cable operation combining carriage of broadcast signals with program origination and common carrier service." 36 F.C.C.2d at 197. (emphasis added) It repeated that contemplation in its Reconsideration, 36 F.C.C.2d at 352.[66]
 
 
 129
 To keep its "Certificate of Compliance," a cable system must comply with the Commission's mandatory access regulations (or seek a waiver, which has no jurisdictional effect). In Frost & Frost Trucking Co. v. Railroad Commission, 271 U.S. 583, 592, 599, 46 S.Ct. 605, 70 L.Ed. 1101 (1926), the Court found it an unwarranted intrusion into the conduct of a private enterprise for the government to mandate that trucking companies offer their services as common carriers or not at all, rejecting the argument that the state could so condition the use of highways. We find it an unwarranted intrusion into the conduct of a cable enterprise for the Commission to mandate that cable companies offer services as common carriers or not at all, and we reject the argument that it may so condition broadcast program retransmission, which has not even the nexus to cablecasting that highways may have to trucking. Teleprompter Corp. v. Columbia Broadcasting System, Inc.,415 U.S. 394, 405, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974).
 
 
 130
 Prior to promulgation of mandatory access rules, cable operators had full discretion to decide what originated programming to distribute over their facilities. That would have remained true if the Commission had enforced its origination rule, under which cable operators need not have transmitted communications of all comers. Access rules, removing discretion from cable operators and forcing them to act as common carriers, do not prevent a business entity from acting in a manner injurious to the public interest. The present rules merely accomplish the coercion into common carrier operations of a business neither acting as, nor holding itself out as, a common carrier.
 
 
 131
 The Commission chooses not to meet directly Midwest's argument that it lacks jurisdiction to force common carrier responsibilities upon cable systems. It merely relies on the broad allegation that its access rules "are reasonably related to achieving objectives."[67] That reliance must fail, for imposition of common carrier responsibilities to achieve broadcast goals impermissibly intermixes the two fields which Congress expressly kept asunder, by its enactment of § 3(h) of the Act, and its separate treatment of common carriers (Title II) and broadcasters (Title III) in the Act.
 
 
 132
 Though the Commission tells us that Midwest Video legitimized its present common carrier type access regulations, the Commission told the Supreme Court that the origination rule there involved was an attempt to require cable systems "to meet some of the same basic standards of responsibility to the public that are imposed on broadcasters." Brief for appellants United States and FCC at 15 n.12, Midwest Video, supra.[68] Because the Commission's 1976 Report regulations are an attempt to require cable systems to meet "standards of responsibility to the public" that cannot lawfully be "imposed on broadcasters; " they are necessarily divorced from, rather than reasonably ancillary to, the Commission's regulation of broadcasting.
 
 II Constitutional Considerations
 
 133
 The 1976 Report access regulations having exceeded the Commission's jurisdiction, it is unnecessary to rest our decision on constitutional grounds and we decline to do so. Benanti v. United States, 355 U.S. 96, 99, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957); Neese v. Southern Railway, 350 U.S. 77, 78, 76 S.Ct. 131, 100 L.Ed. 60 (1955); Peters v. Hobby, 349 U.S. 331, 338, 75 S.Ct. 790, 99 L.Ed. 1129 (1954). Moreover, communications technology is dynamic, capable tomorrow of making today obsolete. Referring to First Amendment rights of broadcasters and the public, in CBS, supra, the Court said, "At the very least, courts should not freeze this necessarily dynamic process into a constitutional holding." 412 U.S. at 132, 93 S.Ct. at 2101.
 
 
 134
 Though we find it unnecessary to resolve the serious constitutional issues raised, we do hold that where, as here, potential incursions into sensitive constitutional rights are involved, careful scrutiny is required in delineating the scope of authority that Congress intended the agency to exercise.Even the broadest opinion, that of the plurality in Midwest Video Corp., recognizes that the Commission can act only for ends for which it could also regulate broadcast television. Indeed, even this standard will be too commodious in certain cases, since * * * the scope of the Commission's constitutionally permitted authority over broadcast television in areas impinging on the First Amendment is broader than its authority over cable television. (Home Box Office, Inc. v. FCC, supra note 29 at 28.)
 
 
 135
 Moreover, the First Amendment overtones, and other constitutional considerations present in the 1976 Report, are such as to reinforce our conclusion on the jurisdictional issue.[69]
 
 
 136
 (a) The First Amendment
 
 
 137
 This is the first case raising the First Amendment implications of a Commission effort to enforce unlimited public access requirements. The Commission has shown a proper care and concern for the First Amendment rights of broadcasters, and for the Act's (§ 326) prohibition of censorship, as illustrated by its resistance to demands for limited access to broadcast television. CBS, supra; Petition, FCC 77-685, supra. That care and concern is remarkably absent from the 1976 Report, compelling unlimited access to cable television.
 
 
 138
 Nor does the Commission make any effort before us to indicate that, in its 1976 Report, it engaged in the required, though difficult, "balancing" task in which it has traditionally engaged with respect to First Amendment values in exercising its jurisdictional responsibilities for broadcast television. Concentrating on creating a public right to exercise freedom of speech on cable television, the Commission gave no thought, on this record, to freedom of the press.
 
 
 139
 The Commission points to no First Amendment right which it believes overrides the First Amendment rights it has recognized in broadcasters but refused to recognize in cable operators. Instead, the Commission's brief dismisses Midwest's concern for its First Amendment rights in four paragraphs, saying only that cable systems retransmit broadcast signals, that Midwest Video authorizes rules designed to achieve the Commission's program diversity "objectives," and that First Amendment goals are promoted by access rules, citing Red Lion Broadcasting Co., supra, and language therein concerning an "uninhibited marketplace of ideas" and "monopolization of that market."
 
 
 140
 Assessment of the proper balance of First Amendment rights must be based on a record, not merely on argument regarding precedent or on resort to an "objectives" rubric. Government control of business operations must be most closely scrutinized when it affects communication of information and ideas, and prior restraints in those circumstances are presumptively invalid. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). "The line between informing and entertaining is too elusive for the protection * * * " of First Amendment rights to turn on that distinction. Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948).
 
 
 141
 In wresting from cable operators the control of privately owned facilities for transmission of programs not acquired from public airwaves, the Commission makes no effort to show that action to have been necessary to protect a "clear public interest, threatened not doubtfully or remotely, but by clear and present danger," or to show "the gravest abuses, endangering paramount interests (which would) give occasion for permissable limitation." Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). As the Court described the majority error below in CBS, supra, 412 U.S. at 126, 93 S.Ct. at 2098, the Commission appears to have "minimized the difficult problems" created by its access rules, and thus "failed to come to grips" with the important First Amendment considerations present "the risk of an enlargement of Government control over the content of (cablecast) discussion of public issues."
 
 
 142
 In its desire to accommodate "users who would otherwise not likely have access to television audiences," 1976 Report, 59 F.C.C.2d at 296, the Commission made no delineation of whether cable systems, absent imposition of its access rules, are public forums. If they are not, it would appear that the present access rules cannot withstand constitutional muster. Every individual's right to speak, precious and paramount as it is, does not include every individual's right to be given the possibility of an audience by government fiat, or to speak in a non-public forum, like a newspaper, a magazine, or on the Senate floor. See American Communications Association v. Douds, 339 U.S. 382, 394, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Avins v. Rutgers, State University of New Jersey, 385 F.2d 151, 153 (3rd Cir. 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968). The First Amendment rights of cable operators rise from the Constitution; the public's "right" to "get on television" stems from the Commission desire to create that "right."
 
 
 143
 It is not enough, therefore, to merely cite the retransmission of broadcast signals by cable systems. As above indicated, no nexus exists between the function of retransmitting broadcast signals and the distinct function of cablecasting. Teleprompter Corp. v. Columbia Broadcasting System, Inc., supra. Cablecasting is communicating, requiring thorough and penetrating consideration of the communicator's First Amendment rights.[70] Cablecasting, however, involves no transmitting over the airwaves or the use of signals acquired from the airwaves.[71]
 
 
 144
 If there be any arguable relationship between cablecasting and retransmission, it would appear far too tenuous and uncertain to warrant a cavalier overriding of First Amendment rights present in cablecasting.
 
 
 145
 Concurring in Home Box Office, supra note 29, Judge Weigel expressed well the concern noted here, in stating:
 
 
 146
 (T)he Commission lacks the power to control the content of programs originating in the studios of cablecasters. Such programs involve neither retransmission of signals received over the air from conventional television broadcasting nor transmission over television broadcasting frequencies. They are offered to users of television sets on terms the users are free to accept or reject.
 
 
 147
 * * * In relation to cablecasting, the power is so fraught with the potential for impingement upon First Amendment rights that it should not be sanctioned by implication.
 
 
 148
 Under its 1976 Report access rules, the Commission is present in each cable operator's studio, holding open the door to all who wish to enter and use it, (turning its back, however, as we shall see, when the pornographer enters). Under some circumstances, the Commission's access rules effectively silence the cable operator, denying him all use of his own facilities, for any exercise of his First Amendment rights. 1976 Report, 59 F.C.C.2d at 316-17. The Fairness Doctrine applicable to cablecasting, 47 C.F.R. § 76.209, would involve the Commission when circumstances give rise to its application, but application of that doctrine to access programs has not on this record been considered by the Commission.[72] The constitutional considerations generated by its access rules require the Commission to evaluate carefully the extent to which it may reside in the studios of cablecasters as one of the issues too sensitive to permit superficial dismissal on the mere ground that cable operators, in a separate activity, retransmit broadcast signals.
 
 
 149
 Though neither Southwestern nor Midwest Video dealt with First Amendment concerns, the Commission says it "contemplated" third party access as among its "objectives" in issuing the origination rule approved in Midwest Video. If that be so, what may have rested on the backroads of the Commission's mind is irrelevant. Our interest is in what the Commission did; and what it did in Midwest Video is entirely distinct from what it did here.
 
 
 150
 Moreover, our concern at this point is with a fundamental First Amendment difference, which the Commission appears to ignore. Under origination the cable operator may permit access of third parties of his selection, and retain ultimate editorial discretion and responsibility regarding what programming material goes out over his lines. Under the present access rules he may choose neither user nor material.
 
 
 151
 The irrelevance of "objectives," as a sole basis for jurisdiction, is even more apparent when objectives are cited as sole justification for access rules, regardless of their effect on First Amendment rights. Red Lion, supra, involved application of the Fairness Doctrine to broadcast television. Its language cannot validate the present access rules or justify a disregard of the constitutional concerns they entail. Citation of Midwest Video and Red Lion cannot serve as a basis for failure to make the First Amendment evaluations required here.
 
 
 152
 The Commission does not favor us with any views as to: (1) why cable systems are not entitled to the same First Amendment rights as other private media, such as newspapers and movie theatres; (2) how compelled access to cable facilities is distinguishable, in a First Amendment context, from compelled access to broadcast facilities; or (3) how its rule, 47 C.F.R. § 76.256(d)(1)-(3), requiring cable operators to exercise prior restraint of obscenity,[73] and the exposure of cable owners to law suits resulting from its access rules, can be justified. Though we refrain from resting our decision on the Constitution, we note the emphasis in the Commission's brief on the notion that access is old and established ground; but when serious First Amendment questions are raised, deja vu will not do.
 
 
 153
 In Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Court held unconstitutional a state effort to compel access to the pages of a newspaper, even for the limited purpose of attack-response. In Home Box Office, supra note 29, at 46, the court said:
 
 
 154
 (S)carcity which is the result solely of economic conditions is apparently insufficient to justify even limited government intrusion into the First Amendment rights of the conventional press, see Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 247-256, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), and there is nothing in the record before us to suggest a constitutional distinction between cable television and newspapers on this point. (footnote omitted)
 
 
 155
 The present access rules strip from cable operators, on four of their channels, all rights of material selection, editorial judgment, and discretion enjoyed by other private communications media, and even by the "semi-public" broadcast media. Cable operators must allow use of their facilities, for transmission toward their paying subscribers, of any program material, no matter the quality, interest, relevance, taste, context, beauty, or scurrilousness (short of obscenity, when prior restraint is physically possible, infra ). They must lease a channel to any person, regardless of business reputation, competence, or financial standing. They must permit third-party installation of equipment on the sets of their subscribers who want to watch the third party's program.[74]
 
 
 156
 Though the Commission's logic would apply, and its "objectives" would be as well achieved, and though newspapers "retransmit" hundreds of government press releases, we assume that no government agency has the fatal-to-freedom power to force a newspaper to add 20 pages to its publication, or to dedicate three pages to free, first-come-first-served access by the public, educators, and government, or to lease a fourth page on the same basis, or to "advance the public interest by opening of (letters-to-editor columns) for use by public and other specified users who would otherwise not likely have access to (newspaper) audiences."
 
 
 157
 Despite the Court's guidance in Miami Herald, supra, the Commission has attempted here to require cable operators, who have invested substantially to create a private electronic "publication" a means of disseminating information , to open their "publications" to all for use as they wish. That governmental interference with the editorial process raises a serious First Amendment issue. Though we are not deciding that issue here, we have seen and heard nothing in this case to indicate a constitutional distinction between cable systems and newspapers in the context of the government's power to compel public access.
 
 
 158
 If the Commission has any authority to intrude upon the First Amendment rights of cable operators, that authority, as above indicated, is less, not greater than its authority to intrude upon the First Amendment rights of broadcasters. Were it necessary to decide the issue, the present record would render the intrusion represented by the present rules constitutionally impermissible.
 
 
 159
 The 1976 Report spawns a further, and serious, constitutional difficulty of another sort. The Commission's access rules require cable operators to create and operate a public forum, with no control of its content, but with an obligation of suppressing speech the government could suppress because of obscenity or indecency. 47 C.F.R. § 76.256(d)(1)-(3).[75] In so mandating, the Commission appears to have created a corps of involuntary government surrogates, but without providing the procedural safeguards respecting "prior restraint" required of the government.[76] In Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 560, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the Court described those safeguards as: (1) the censor must initiate judicial proceedings and prove the material unprotected; (2) restraint prior to judicial review can be only for a brief period, to preserve the status quo; and (3) prompt judicial determination must be assured.
 
 
 160
 When cable operators asked how they could censor obscenity in the open access system required by the 1976 Report, the Commission issued a Clarification, supra note 19, which stated that cable operators must "enforce" the rule, and must proscribe all obscene and indecent matter, and, "Indeed, he is responsible to the Commission for doing so." 59 F.C.C.2d at 984. The Commission said cable operators should exercise a prior restraint when possible, and, when that is not possible,[77] cable operators should exclude the offender from access in the future. Thus the Commission made the cable operator both judge and jury, and subjected the cable user's First Amendment rights to decision by an unqualified private citizen, whose personal interest in satisfying the Commission enlists him on the "safe" side the side of suppression.
 
 
 161
 Nor does the Clarification appear to have dealt with the chilling effect which fear of future disbarment would have upon access users (though it referred to such an effect on access services if cable operators had to pre-screen numerous programs). Neither did it discuss the effect on subscriber allegiance to a cable system which must permit live access programmers at least one bite at the obscenity apple. The Clarification "suggested" that "distasteful" programs be cablecast at hours that would "minimize exposure to children," but specifically refused to either require or prohibit such scheduling. 59 F.C.C.2d at 985. How any "scheduling" could be done, of programs unknown to and under no control of the operator, was not discussed. Nothing was said in the Clarification respecting the prior-restraint safeguards specified in Southeastern Promotions, Ltd. supra, or in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).
 
 
 162
 (b) Due Process
 
 
 163
 Midwest argues persuasively that the 1976 Report mandatory construction and access rules constitute a taking of private property without just compensation and deny cable owners an opportunity to earn a fair rate of return, in violation of the due process clause of the Fifth Amendment.
 
 
 164
 The Commission makes no effort to show that its access rules do not violate the due process provisions of the Constitution. It merely dismisses petitioner's arguments on its "objectives" and on the ground that the same arguments were rejected by this court in Black Hills Video Corp. v. FCC, supra note 71, and by the Supreme Court in Midwest Video.
 
 
 165
 Though we find it unnecessary to resolve the issue, we have rejected the objectives argument above, and we suggest the inappropriateness of the Commission's legal precedent argument. That a violation of due process rights under the Constitution may not have been earlier found by a court, in reviewing regulations concerning cable's use of a microwave company's services and non-duplication rules, as in Black Hills, or concerning an origination rule, as in Midwest Video, cannot for a moment mean that due process concerns raised by the 1976 Report mandatory construction and access rules may on that ground be dismissed. As in the matter of jurisdiction, each regulation must on its own pass, or fail to pass, constitutional muster.
 
 
 166
 In promulgating regulations requiring expenditures of many millions of dollars for construction and public dedication of additional channels and equipment, the Commission was not at liberty to disregard due process rights of cable operators, or of cable consumers to whom most if not all costs will be passed. Whether those rights be labeled "economic" or otherwise, they are not in our view obsolete.[78] The human right to own property is a most fundamental right, the alleged deprivation of which cannot be ignored because that right was found uninfringed, or overtaken by the public interest, in cases dealing with earlier and different regulations. If consumers' money is to be taken, in response to a federal regulatory agency's view of the public interest, it must be upon a record far less speculative than that at hand, and on a far stronger basis than court decisions relating to other regulations.
 
 
 167
 The present access rules, scraped free of argumentative barnacles, require the construction of facilities and their dedication to the public. Presumably, a requirement that facilities be built and dedicated without compensation to the federal government (for public use) would be a deprivation forbidden by the Fifth Amendment. A "taking" does not require that the government take title. United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). That the forced dedication be direct to the people, rather than indirect through their government, would appear to be of no constitutional moment.
 
 
 168
 We express concern, also, over the Commission's approach to a further problem engendered by its 1976 Report regulations. When the cable operator, in policing his access channels, is considering whether an access user is being or has been "obscene" or "indecent,"[79] or whether access should be denied for any reason, there are ghosts in the wings. On one side lurks a fear of violating the Commission's rules, and potential loss of his "Certificate of Compliance." On the other stands the potential for violation of the access user's rights. The exposure of cable operators to law suits, by access users claiming prior restraint of their First Amendment rights, or interference with their new-found "right" to be on cable television whenever, and as often as they like, by the state for his having transmitted obscene material, by outraged subscribers (whether outraged by obscenity or outraged by having to pay for it) or by persons denied access for any reason, is among the problems which do not appear to have been fully considered by the Commission in its removal of the cable operator's control over his system's programs. The Commission did speak of the censorship and law suit problem in its Cable Report, 36 F.C.C.2d at 196:
 
 
 169
 We have adopted the no-censorship requirement in order to promote free discourse; this is, we believe, valid regulation having "the force of law." While the matter is of course one for resolution by the courts, State law imposing liability on a system that has no control over these channels may unconstitutionally frustrate Federal purposes. In any event, if a problem should develop in this respect, it is readily remedied by Congress and, in this connection, we would welcome clarifying legislation. ([80])
 
 And again on reconsideration:
 
 170
 Various parties have questioned our judgment that there seems little likelihood of civil or criminal liability against cable operators from the use of access channels. The parties contend, understandably, that our feeling in this matter, however persuasive, is hardly a guarantee. They note, further, that although the cable operator will have no control over program content on access channels, he is charged with proscribing the presentation of obscene material. It is suggested that to this extent, at least, the operator will, in effect, be required to exercise control. To clarify this area, we are requested to seek legislation to grant immunity to a system operating under our access rule. We, of course, appreciate petitioner's concern over the liability issue. We still believe, however, that existing case law solves most problems in this area (footnote omitted). (Reconsideration of the Cable Television Report and Order, 36 F.C.C.2d 326, 357 (1972).)
 
 
 171
 The subjection of cable operators to potential liability because of the acts of third parties over which they have no control, and the burden and expense of cable operators in trying to convince state courts that the Commission's regulations supersede state law, was not addressed in the 1976 Report.
 
 
 172
 The Commission, in its requirement that cable operators exercise prior restraint of obscenity in access cablecasting, attempts to transfer to cable operators the very censorship power statutorily forbidden to the Commission in § 326 of the Act.[81] The Commission's "belief" that cable operators would be free of legal liability because they were only following orders seems ill-founded when the orders are to do what it cannot do.
 
 
 173
 The aplomb with which the Commission is willing to forcefully expose cable operators to criminal and civil suits, with all of the uncertainties and serious liberty and financial risks involved in defending them, particularly in these years of America's litigious binge, raises serious questions, about the rationality of the access rules, about the lack of evidence showing a public interest so strong as to warrant them, and about the due process interests affected; all of which would require the closest judicial scrutiny if the access rules of the Commission were to be otherwise held within its jurisdiction.
 
 III The Record
 
 174
 Because the mandatory access and channel capacity rules of the 1976 Report exceed the jurisdiction of the Commission, we refer to the record only because our reference may be of use in further proceedings.
 
 
 175
 Concerning abandonment of its cable origination rule, the Commission stated:
 
 
 176
 Quality, effective, local programming demands creativity and interest. These factors cannot be mandated by law or contract. The net effect of attempting to require origination has been expenditure of large amounts of money for programming that was, in many instances, neither wanted by subscribers nor beneficial to the system's total operation. In those cases in which the operator showed an interest or the cable community showed a desire for local programming, an outlet for local expression began to develop regardless of specific legal requirements. During the suspension of the mandatory rule, cable operators have used business judgment and discretion in their origination decisions. For example, some operators have felt compelled to originate programming to attract and retain subscribers. These decisions have been made in light of local circumstances. This, we think, is as it should be. (Report and Order in Docket No. 19988, 49 F.C.C.2d 1090, 1105-06 (1974).)
 
 
 177
 The Commission does not tell us how, if at all, its mandatory access rules would result in "(q)uality, effective, local programming" with the required "creativity and interest" by legal mandate; or why their "net effect" would not be an even greater "expenditure * * * for programming * * * neither wanted by subscribers nor beneficial to the system's total operation;" or why "an outlet for local expression" would not begin to develop under voluntary access "regardless of specific legal requirements" when a "cable community showed a desire" for access programs; or why, if such desire occurred, operators would not feel "compelled" to supply access programs to "attract and retain subscribers;" or why decisions on origination programming "in light of local circumstances" is "as it should be," while decisions on access programming in that "light" should be denied by force of law to operators, subscribers, and local franchise authorities. In sum, the Commission, in mandating channel construction and public access, appears to have gone directly contrary to its origination experience.[82]
 
 
 178
 The Commission makes no response, on the merits, to Midwest's argument that the access rules are arbitrary, capricious, and irrational, but remains content to argue that the record information behind its Cable Report, by which it first adopted access rules, is not before us.
 
 
 179
 We do not here find it necessary to review the present record in the detail required when a decision turns on the nature of the rulemaking process, Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, the Cable Report itself, the 1976 Report, and its record information, are more than sufficient to illustrate the Commission-recognized speculative nature of the agency's mandatory access action, and to raise a serious question of whether it would be sustained on the administrative record.
 
 
 180
 Moreover, the right of Midwest, to whom access rules were first made applicable by the 1976 Report, to judicial review of its challenge to the rationality of access rules per se is even more certain than that of petitioner in Functional Music, Inc. v. FCC, 107 U.S.App.D.C. 34, 274 F.2d 543 (1953), where the underlying rules had long been applicable to petitioner.
 
 
 181
 The Commission's arbitrary approach to imposition of its "access concepts" appears reflected in the 1976 Report. Disregarding the results of its flawed faith in origination, the Commission compelled construction of facilities on the obvious fact that failure to construct them would impede their use and on the mere theory and assumption that if they are built they will someday be used.[83] Throughout the 1976 Report, the Commission describes most of its rules as involving "difficult" problems. In withdrawing and modifying its Cable Report rules, the Commission itself characterized some of those earlier rules as: imposing "a very significant burden * * * for which there is no reasonable foreseeable need," 59 F.C.C.2d at 306; requiring a two-way capacity for which "developments * * * have been far slower than was anticipated * * *," id. at 309; imposing a "burden (converter installation) we have required system operators to meet (we think) is unreasonable * * *," and imposing a cost on "the subscriber who must ultimately pay * * * whether or not he wishes to view the programming being provided * * *," and that may have impeded construction of cable systems in new communities. Id. at 313.[84]
 
 
 182
 In 1974, the Commission stated that it was "too early to discern any trends regarding our leased access channel rules," and that "access is still in its infancy and it has a long-hard-struggle ahead before it becomes an accepted part of the communication process in this country. We knew this would be the case when we instituted the rules * * *." Clarification of the Cable Television Rules, 46 F.C.C.2d 175, 185 (1974). Two years later, the 1976 Report contains no discussion of any evidence or investigation of trends favoring leased or other access channel rules.
 
 
 183
 The Commission implicitly and explicitly recognized that there was insufficient evidence of demand for access programs, present or future, by users or viewers. Recognition of that lack of evidence, and the speculative roots of the present access rules, appear implicitly in the Commission's reliance on the need to build facilities so they can create their own use, and in its specific refusal to rely on the marketplace. Explicitly, the 1976 Report contains: "While the overall impact that use of these (access) channels can have may have been exaggerated in the past, nevertheless we believe they can, if properly used, result in the opening of new outlets for local expression * * *," 59 F.C.C.2d at 296; "there may be need (outside major television markets) for access services * * *." Id. at 300. "In addition, the audiences viewing access programming on such (small systems inside major markets) may reasonably be expected to be so small that a federally imposed requirement would appear inappropriate." Id. at 303. "Based upon the comments filed in this proceeding as well as those filed in Docket 20363 and our experience generally, while it would appear that the use of access channel is growing, in the vast majority of communities presently providing multiple channels for access use, these channels are at best sporadically programmed." Id. at 314 (emphasis added). On reconsideration, speaking of possible denial of access services by cable operators, the Commission said, "Our present experience has been, however, that even larger systems typically have difficulty finding access channel users so this problem with smaller systems is not likely to arise with any frequency." 62 F.C.C.2d at 403 (emphasis added).[85]
 
 
 184
 The Commission's apparent inability, or unwillingness, to assemble a rational factual basis for its belief that its "access concept" will "work" is the more surprising in view of its relatively long experience with the subject.[86] Seven years before the 1976 Report, the Commission referred to a possible future requirement for leased access, and adopted the "basic goal" of maximum program choice through public access to cable facilities. CATV, First Report and Order, 29 F.C.C.2d 201, 205-06 (1969). Its coercive reach for that goal occurred in 1972, four years before the 1976 Report, when it issued the channel construction and access rules of the Cable Report. In the Cable Report, the Commission stated that its judgments on how access would evolve were "intuitive" and that "necessary insights" would be needed. 36 F.C.C.2d at 194, 197, 352. In 1974, two years before the 1976 Report, the Commission repeated its dedication to use of the public power in pursuit of its predilection for access. Clarification of the Cable Television Rules, 46 F.C.C.2d 176, 179-80 (1974). In 1976, still devoid of evidence that any meaningful present or future public demand for access could be expected, the Commission introduced its present action by saying, "We wish to emphasize at the outset that we do not intend in this proceeding to abandon our goals for access cablecasting; * * *." Notice of Proposed Rule Making, 53 F.C.C.2d 782, 784 (1976).
 
 
 185
 In its 1976 Report, as above indicated, the Commission adhered to its faith in access as a naked "concept," refusing to seek evidence that the public interest would not be harmed by mandating consumer expenditure of millions for equipment never used.[87] The Commission's refusal "to leave the provision of channel capacity and access services entirely to the marketplace * * *," 59 F.C.C.2d at 321, appears contrary to the law limiting the Commission within its statutory jurisdiction, where access to broadcast facilities is governed not by regulation but by market forces. FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 84 L.Ed. 869 (1940).
 
 
 186
 It is not readily apparent that the present rules were based on a clear administrative record that shows existence of a problem justifying intrusion on First Amendment rights, or that relates a "solution" to the agency's statutory mandate as required by United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Further, the mandatory access rules explicitly and candidly appear to curtail expression indirectly by favoring access seekers over cable system owners, contrary to the injunction of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976).
 
 
 187
 There may rarely be time for complete answers and insights, but the Commission appears to have here failed to defensibly articulate a rationality for its access rules. If jurisdiction were present, and it were therefore necessary to give the present record the "hard look" referred to by Judge Leventhal in Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), it is at best doubtful that a court could avoid finding it reflective of agency action arbitrary and capricious.
 
 Conclusion
 
 188
 The 1976 Report mandatory channel capacity, equipment, and access rules exceeded the jurisdiction of the Commission. Accordingly, they are set aside.
 
 
 189
 WEBSTER, Circuit Judge, concurring.
 
 
 190
 I concur in the Court's decision to set aside the Commission's regulations because they are outside the statutory jurisdiction conferred on the FCC in the area of cable television. (See Part I of the opinion.) While I am in general agreement with the extensive and well-reasoned analysis of the constitutional questions contained in Chief Judge Markey's opinion (see Parts II and III), I refrain from joining it because disposition of the case on the jurisdictional basis makes it unnecessary to reach those questions.[1]
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 The 1976 Report modifies and replaces earlier regulations on mandatory access and channel capacity, Cable Television Report and Order, 36 F.C.C.2d 143, affirmed on reconsideration, 36 F.C.C.2d 326 (1972) (Cable Report ). Our holding, that the access rules of the 1976 Report exceed the jurisdiction of the Commission, carries with it the substantially identical, though more onerous, rules of the Cable Report
 
 
 [2]
 Community-wide, coaxial cable television systems were earlier called "Community Antenna Television" or "CATV" systems. The Commission now uses the more inclusive "cable television," Cable Report, as do we. See 47 C.F.R. § 76.5(a) (1976)
 
 
 [3]
 See note 1 supra
 
 
 [4]
 Briefs Amicus Curiae or as Intervenors were filed by National Cable Television Association, Inc.; Teleprompter Corporation; National Black Media Coalition, Citizens For Cable Awareness in Pennsylvania, and Philadelphia Community Cable Coalition, jointly; and Coldwater Cablevision Incorporated and Michigan CA-TV Company, jointly
 
 
 [5]
 Of the extensive commentary, these are representative: Barrow, Program Regulation in Cable TV: Fostering Debate in a Cohesive Audience, 61 Va.L.Rev. 515 (1975); Bretz, Public Access Cable TV: Audiences, J. of Com., Summer 1975 at 15; Doty, Public Access Cable TV: Who Cares, J. of Com., Summer 1975 at 23; Price, Requiem for the Wired Nation: Cable Rulemaking at the FCC, 61 Va.L.Rev. 541 (1975); Lapierre, Cable Television and the Promise of Programming Diversity, 42 Fordham L.Rev. 25 (1973); S. Rivkin, Cable Television: A Guide to Federal Regulations (1973); Barrow, The New CATV Rules: Proceed on Delayed Yellow, 25 Vand.L.Rev. 681 (1972); Park, Cable Television, UHF Broadcasting, and FCC Regulatory Policy, 15 J. Law & Econ. 207 (1972); Posner, The Appropriate Scope of Regulation in the Cable Television Industry, 3 Bell J.Econ. & Mtg.Sci. 98 (1972); R. Smith, The Wired Nation: Cable TV: The Electronic Communications Highway (1972); Sloan Commission on Cable Communications, On the Cable: The Television of Abundance (1971); Note, The Wire Mire: The FCC and CATV, 79 Harv.L.Rev. 366 (1965)
 
 
 [6]
 The 12 channels are in the "low band" and "high band" portions of the MHz spectrum. The 20 channel capacity requirement in the 1976 Report necessitates use of the "mid-band," and a concomitant expense of construction and rebuilding
 Technophiles say that present technology enables installation of as many as 80 channels, and that the advent of laser-ray carriage of television signals, with virtually unlimited channels, may replace cable. See Field, Laser Video Is Intriguing, But Is It Useful? N.Y. Times, Sept. 18, 1972, at 37, col. 3.
 
 
 [7]
 The Commission candidly and repeatedly admitted an inability to determine the fact of adverse impact, Report and Order on Inquiry, supra, 26 F.C.C. at 421-22, 424, 436; First Report and Order on Grant of Authorizations in the Business of Radio Service for Microwave Stations to Relay Television Signals to Community Antenna Systems, 38 F.C.C. 683, 710-11 (1965), and Second Report and Order on Grant * * * Antenna Systems, 2 F.C.C.2d 725, 773, 781 (1966). Yet the Commission refused a request for an experiment to test impact, Suburban Cable TV Co., 9 F.C.C.2d 1013 (1967)
 
 
 [8]
 Whether agencies become captives of their regulatees, and whether the "barter process" before agencies must be accepted in place of "ideal" rulemaking, see Jaffe, The Illusion of the Ideal Administration, 86 Harv.L.Rev. 1183 (1973), and whether to use an imperfect analogy, the motion picture industry could have advanced as rapidly against vaudeville under a Federal Entertainment Commission, or the airlines as rapidly under a Federal Transportation Commission regulating railroads and airlines, the wisdom and implications to social progress of a regulatory system that enlists the power of government to preserve established industry against new technological competition, as distinguished from reliance on consumer preference at a perceived risk of market chaos, is a matter for the Congress, not the courts
 
 
 [9]
 A bill giving the Commission full licensing authority over cable television failed on the Senate floor. S. 2653 S.Rep. No. 923, 86th Cong., 1st Sess. (1959). The Commission's own legislation was introduced in 1961. S. 1044 and H.R. 6840, 87th Cong. 1st Sess. (1961). Congress took no legislative action. The matter was again considered in 1965 and 1966. Hearings on H.R. 7715 Before the Subcomm. on Communications and Power of the House Committee on Interstate and Foreign Commerce, 89th Cong., 1st Sess. (1965); Hearings on H.R. 12914, H.R. 13286, and H.R. 14201 before the House Committee on Interstate and Foreign Commerce, 89th Cong., 2d Sess. (1966)
 
 
 [10]
 Cable owners may welcome the Commission, as regulator-protector-servant. Dealing en masse with the Commission, which dictates to local franchising authorities, 47 C.F.R. § 76.258, may be easier than facing those authorities one-on-one; the Chief of the Cable Television Bureau desired to regulate pay movies in hotel rooms as competitors to cable television. 12 Weekly TV Digest, Oct. 16, 1972 at 2. Cable and broadcast industries may one day require "protection" against the threat that direct satellite-to-home television will replace both
 
 
 [11]
 For more detailed discussion of: (1) the potential technological capacities of cable telecommunications; (2) the Commission's initial declination of jurisdiction; (3) its later, growing effort to regulate; (4) its changes in justification, from protection of local VHF broadcasting stations, to fostering of UHF growth, to a fight against "unfair competition;" (5) the utopian forecasts of cable's potential, and ensuing disappointments; and (6) the oft-repeated pattern of regulations withdrawn, waivered, and abandoned, see the literature listed in note 5 supra, particularly Lapierre, Cable Television and the Promise of Programming Diversity, 42 Fordham L.Rev. 25 (1973), and Price, Requiem For the Wired Nation: Cable Rulemaking at FCC, 61 Va.L.Rev. 541 (1975)
 
 
 [12]
 Four Justices joined a plurality opinion; four dissented. The Chief Justice concurred in the result
 
 
 [13]
 In Midwest Video, supra, 441 F.2d at 1328, this court said it was "highly speculative whether there is sufficient expertise or information available to support a finding that the origination rule will further the public interest." In reversing, the plurality considered that holding "patently incorrect" 406 U.S. at 671, 92 S.Ct. 1860
 
 
 [14]
 Midwest was not operating in one of the top 100 markets and its standing to challenge these rules would have been doubtful. See Midwest Video Corp. v. United States, supra, 441 F.2d at 1328. ACLU complained of the Commission's failure (1) to impose common carrier obligations, and (2) to limit cable owners to one channel. The Ninth Circuit denied ACLU's petition for review. American Civil Liberties Union v. FCC, 523 F.2d 1344 (9th Cir. 1975). The Commission emphasizes here a phrase of the opinion in that case as indicating judicial approval of its access rules, but there was no challenge to its jurisdiction to issue its access rules before that court
 
 
 [15]
 How adoption of a demand-governed approach after construction could save the construction costs was not explained
 
 
 [16]
 Of course access channels were not actually "available" on most systems, hence the Commission's felt need to order their construction
 
 
 [17]
 We deal here only with mandatory access. Nothing in present law or in this opinion precludes a cable system operator from voluntarily providing public access
 Moreover, the present case involves only the jurisdiction of the Commission to issue its Federal access and equipment rules. The only direct effect of our opinion on the election of local franchising authorities, to require or waive access requirements in the light of community needs and interests, is to free those authorities from the Commission's restrictions, found in 59 F.C.C.2d at 324-25. 47 C.F.R. § 76.258.
 The Commission mis-relies on the presumed right of franchising authorities to condition local franchises on provision of access channels as justification for its doing so. The Commission's jurisdiction must come from Congress, not from local authorities.
 ACLU implies the demise of all public access if mandatory access rules are not upheld. Nothing of record so indicates. Conjecture could equally invisage voluntary continuation and expansion of existing access programs. In all events, the Commission's jurisdiction is not expandable through application of unauthorized regulations, nor can application convert unauthorized regulations into authorized regulations, over the short term and prior to direct court challenge.
 Though ACLU argues that mandatory access must be continued to protect the "investment" of present access users, no one can be said to have reasonably relied on, or established an equity in continuation of, Commission cable regulations which have been consistently and continually revised, unenforced, withdrawn, waivered, and abandoned. Nor may vested interests be normally acquired in continuation of regulations exceeding ab initio the jurisdiction of the issuing agency.
 
 
 [18]
 The March 31, 1977 deadline was previously cancelled in Report and Order in Docket No. 20363, 54 F.C.C.2d 207 (1975). Petition for review is pending in National Black Media Coalition v. FCC, D.C. Cir. Appeal No. 75-1792, a case held in abeyance pending outcome of these consolidated cases
 
 
 [19]
 In its Clarification of Section 76.256 of the Commission's Rules and Regulations, 59 F.C.C.2d 984, 986 (1976), the Commission amended these regulations to provide that cable operators enforce the rules which they are required to establish against obscenity and indecency
 In American Civil Liberties Union v. FCC, No. 76-1695 (D.C.Cir.), ACLU has challenged the rules found at 47 C.F.R. § 76.256(d)(1)-(3) as unconstitutionally imposing a prior censorship obligation on cable operators. Upon an order of the court in that pending case, issued August 26, 1977, 47 C.F.R. § 76.256(d)(1)-(3) has been stayed to the extent that it prohibits the presentation of obscene or indecent matter pending the conclusion of proceedings upon remand to the Commission. However, the Commission may decide not to repeal this provision. Thus, to prevent multiple remands, we view this provision as before us as part of the 1976 Report as clarified. 59 F.C.C.2d 984.
 
 
 [20]
 The Commission interpreted this rule as requiring equipment availability beyond normal business hours, Reconsideration of Report and Order in Docket No. 20508, 62 F.C.C.2d 399, 406 (1976), and as not permitting a charge for use of automated services to play tapes and films, id. at 407, even if the playing runs longer than five minutes. The Commission requires cable operators to permit the installation of converters by third parties who wish to use the operators' facilities and who will pass the cost of converters to subscribers desiring to view the program of the third party. It also insists that cable operators with limited capacity defer their own programming in favor of access users. "We shall scrutinize the actions of operators who, while providing their own programming, assert that their activated capability is insufficient to permit the leasing of a channel to potential competitors." 1976 Report at 316. The Commission believes that time and weather channels, though of "substantial benefit to subscribers," should also give way to access programs. Id. at 316 n. 19. If only one channel is available for use by access seekers, the cable operator will be in "bad faith" if he uses that channel for pay programming. Id. at 317
 
 
 [21]
 Jurisdiction to require minimum channel capacity and two-way capacity has not been argued separately from the mandatory access requirement. Channel capacity is apparently necessary to provide access channels. The Commission has linked two-way capacity with the 20-channel requirement in the same regulation, apparently because the cost is lower if such capacity be added when the 20 channels are built. The relationship of mandatory access to a two-way capacity requirement is not as clear as that of the 20-channel requirement, but to the extent that two-way capacity relates to the "access concept" or that two-way capacity cannot be separated from the 20-channel requirement, it must fall with the 20-channel and other regulations of the 1976 Report. If cable systems offer two-way communications services, those services may be subject to regulation in accord with their nature, which is distinct from that of program distribution services affected by access requirements. In adopting its two-way capacity requirement, the Commission recognized that it could not preempt state or local regulation of intra-state, two-way, non-video communications, citing Nat'l Ass'n of Reg. Util. Comm'rs v. FCC, 174 U.S.App.D.C. 374, 533 F.2d 601 (1976). The Commission interpreted that decision narrowly, stating that it did not foreclose authority to order two-way capacity, and that some functions of that capacity relate to broadcast program distribution. 59 F.C.C.2d at 310-11
 In broadcast television, British viewers may acquire the "teletext" device, enabling them to call up on their sets data blocks (100 magazine pages) in which the desired information can be found, or the "viewdata" system, employing telephone lines, for calling up on their sets the specific information desired. British Hook Up TV To Printed Magazine, Washington Post, Dec. 25, 1977, at D4. Whether the Commission has considered any requirement for "two way capacity" on broadcast television is not of record.
 Two-way capacity service may well acquire consumer interest and demand. See, e. g., Columbus Folk Can Talk Back When TVs Become Annoying, The Cincinnati Enquirer, Dec. 1, 1977, at A-6.
 
 
 [22]
 Because we hold the regulations under review to have gone too far, it is unnecessary to discuss at length all other contentions raised by Midwest, amici curiae, and intervenors, or to treat ACLU's contention that the regulations did not go far enough
 
 
 [23]
 In its 1976 Report and elsewhere, the Commission has recognized that cable systems are neither common carriers nor broadcasters, but has justified its rules by labelling cable systems as a "hybrid" of both, without explanation of how a system, when it does not offer a service of transmitting the communications of others, incorporates any aspect of "common" carriage, or how a system that employs no frequency of the broadcast spectrum to cablecast, and that sends its transmissions only to its own specific subscribers and not into the airwaves, incorporates any aspect of "broadcasting." The operative fact would appear to be that cable systems, because they retransmit broadcast programs, and because their subscribers may also receive over-the-air broadcast programs, may affect the broadcast television industry. Whether that effect be viewed as a competitive threat to broadcasters, as detrimental to conventional television service to the public, or as impeding the legitimate statutory goals of the Act, the Commission has deemed it necessary, in the absence of Congressional guidance, to devote a major effort over recent years to attempted regulation of cable television
 
 
 [24]
 Concerning the new satellite communication technology, Congress appears to have had little difficulty in adopting appropriate legislation, i. e., the Communications Satellite Act of 1962, 47 U.S.C. §§ 701-44 (1970). Further, when Congress has wished to include cable systems in a provision of the Act, it has done so. 47 U.S.C. § 314 (1970), as amended by Act of Oct. 15, 1974, Pub.L. No. 93-443, Titles II, IV, §§ 205(b), 403, 88 Stat. 1278, 1291
 
 
 [25]
 As authority for its 1976 Report, the Commission lists Sections 2, 3, 4(i) and (j), 301, 303, 307, 308, 309, 315, and 317 of the Act. 1976 Report, 59 F.C.C.2d at 327. Section 2 states those to whom the statute applies. Section 3 is "definitions." Section 4(i) gives authority for all acts necessary to the Commission's function. Section 4(j) specifies proceedings. Sections 301, 307, 308, and 309 cover licensing of broadcasters. Section 303 covers powers and duties of the Commission. Section 317 covers announcements by broadcasters. Section 315 covers equal time for political candidates. The sole reference to cable systems appears in Section 315. The 1976 Report has no relation to equal time for political candidates on cable television, which is covered in a separate regulation, 47 C.F.R. § 76.205
 Realism impels recognition that delegation is a necessary part of the modern legislative function. There being no delegation of power over cable systems, we do not here determine a normal "breadth of delegation" question. In a sense, the Commission's rationale, and the Court's "reasonably ancillary" standard, may be analogized to the "necessary and proper" clause, Const. art. I, § 8, cl. 18, applicable to the Congress. If so, the power to issue the present construction and access rules, as discussed infra, is not necessary and proper to "carry into execution" the Commission's delegated powers over broadcast television.
 
 
 [26]
 That the compliance deadline for some cable systems was rolled forward to 1986, and that the Commission stands ready to "waive" its requirements for those systems able to sustain the burden of proving undue hardship on them individually, cannot justify an agency action exceeding its jurisdiction ab initio
 
 
 [27]
 The actual Commission order before the Court was in the nature of a "stay," under which no further importation would be permitted until the Commission had had a chance to fully consider the matter. 392 U.S. at 160, 88 S.Ct. 1994
 
 
 [28]
 Section 303(g) of the Act provides:
 
 
 [303]
 Powers and duties of Commission.-
 (g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest * * *. (47 U.S.C. § 303(g) (1970))
 The plurality opinion did not mention the distinction between "radio," which transmits in the electronic broadcast frequency spectrum, and cable systems, which do not.
 
 
 [29]
 We are not alone in the view that the Commission's jurisdiction found in Midwest Video must represent the "outer limits." The D.C. Circuit, speaking of Midwest Video and Southwestern, has said, "That these cases establish an outer boundary to the Commission's authority we have no doubt * * *." Home Box Office, Inc. v. FCC, et al., 567 F.2d 9, at 28 (D.C.Cir. 1977), cert. denied, ---U.S. ----, 98 S.Ct. 621, 54 L.Ed.2d 484 et al. (1977)
 
 
 [30]
 The 1976 Report, 59 F.C.C.2d at 326, itself divorces the present access rules from cable regulations based on the public interest in commercial television:
 In the former case (channel capacity and access rules) we seek to promote the expansion of communications services as well as the expansion of the public's access thereto, while in the latter (limitations on broadest programs retransmittable to cable consumers) we seek to insure that the interest of the public in maintaining a healthy commercial television structure will not be undermined. Although there is some relationship between the two considerations, each must be considered on its merits.
 
 
 [31]
 Midwest Video, supra, 406 U.S. at 661, 92 S.Ct. 1860
 
 
 [32]
 At the time of Midwest Video, cable operators made "no contribution" for the broadcast signals they retransmitted, and the Chief Justice referred to cable systems' "on stream" with broadcasting activities as incurring some burden. Though broadcasters might have been earning more from advertisers through cable's increase in their audience, cable operators are now required to pay a royalty on retransmission. See 17 U.S.C. § 111 (1976)
 
 
 [33]
 The Commission appears to have no need for the Court's "reasonably ancillary" standard. In the 1976 Report, 59 F.C.C.2d at 299, the Commission reaffirmed its view that cable television "is a hybrid that requires identification and regulation as a separate force in communications." The difficulty with that self-serving view is manifold: it lacks statutory basis; it is open ended, authorizing almost any regulation; and its "separate force" concept ignores the "reasonably ancillary" standard. A private industry does not "require" federal regulation just because a federal agency says it does
 
 
 [34]
 In discussing the definition of cablecasting the plurality stated:
 "Cablecasting" was defined as "programing distributed on a CATV system which has been originated by the CATV operator or by another entity, exclusive of broadcast signals carried on the system." * * * As this definition makes clear, cablecasting may include not only programs produced by the CATV operator, but "films and tapes produced by others, and CATV network programing." * * * Although the definition now refers to programing "subject to the exclusive control of the cable operator," this is apparently not meant to effect a change in substance or to preclude the operator from cablecasting programs produced by others." (406 U.S. at 653 n. 6, 92 S.Ct. at 1863.)
 The plurality opinion also indicates an awareness that, prior to its Midwest Video decision, mandatory public access requirements had been introduced in the 1972 Cable Report, but the only regulations before the Court in Midwest Video were those promulgated in the First Report and Order, 20 F.C.C.2d 201 (1969). See 406 U.S. at 654 n. 8, 92 S.Ct. 1860.
 
 
 [35]
 A further difference is that under the origination rule programs would have at least been produced, though program quality and viewer interest were not assured. The present rules merely insure that cable owners will spend money to construct studios and channels and install equipment, passing some or all of the cost to their consumer-subscribers
 
 
 [36]
 The Commission's argument built on Midwest Video concentrates on what is claimed to be the Court's "approval" of the Commission's "objectives" in that case
 
 
 [37]
 The entire tone of the Commission's Notice of Proposed Rulemaking in Docket No. 20508, 53 F.C.C.2d 782, and its 1976 Report, indicates a devotion to the goal, per se, of public access to cable television. "Accordingly, we specifically reaffirm the commitment which we made to the public, educational, governmental and leased access concepts contained in the Report and Order (Cable Report )," 53 F.C.C.2d at 790, and "reaffirm our commitment to access * * * (and) to pursue our access goals * * *," 53 F.C.C.2d at 795 (emphasis added)
 
 
 [38]
 The Commission says its objectives were "recognized" in Midwest Video. The plurality there did say that the Commission had reasonably determined that the origination rule would further achievement of the objectives cited to the Court, 406 U.S. at 667-68, 92 S.Ct. 1860, but the relationship of even those objectives to mandatory access rules was not before or discussed by the Court. It was also indicated generally in Midwest Video that the Commission was not limited to preventing cable's adverse impact on broadcasting, but could regulate cable systems toward achievement of statutory objectives, and that the Commission's objectives were within its "mandate for the regulation of television broadcasting." 406 U.S. at 668, 92 S.Ct. 1860 (emphasis added). Though the Court in Midwest Video stated that § 2 of the Act, 47 U.S.C. § 152, contained no objectives "for which the Commission's regulatory power over CATV might properly be exercised," 406 U.S. at 661, 92 S.Ct. at 1867 the Commission cited § 2 as among the statutory sections authorizing the present access rules
 
 
 [39]
 As discussed at p. 1047, infra, whatever the "long-established goals" are, their achievement cannot lawfully be attempted "in the field of television broadcasting" by means of the access rules here at issue. That fact weighs heavily against the claim of jurisdiction to issue these rules as "reasonably ancillary" to the Commission's "responsibilities for broadcast television." Moreover the notion that a federal agency may lawfully compel a private industry, in any field, to build facilities, to dedicate them to free public use, and to police that use against obscenity, appears at best unique
 
 
 [40]
 "In the future everybody will be world famous for fifteen minutes." Andy Warhol, Boston Book and Art, 3d ed., p. 12 (1970)
 
 
 [41]
 Congress would still be needed to create and fund agencies, and courts might still be needed to rubber-stamp every action likely to achieve the broad "objectives" improvised by the agency
 
 
 [42]
 The illogic of considering agency objectives as sole justification for agency action is illustrated here. The goal of "increasing the number of outlets for local self-expression" can be facilitated by requiring not just cable systems, but theatres, newspapers, broadcast stations, museums, concert halls, universities, and all who have acquired an audience, to grant free public access to their facilities and to a possible "shot" at their audiences
 ACLU points to Nat'l Citizens Comm. for Broadcasting v. FCC, 181 U.S.App.D.C. 1, 555 F.2d 938, (1977) in support of a presumption in favor of diversity of expression. In that case, however, the court dealt only with broadcasters, holding that the Commission could not refuse to order divestiture of cross-owned radio and television stations, because divestiture increases the likelihood that the public will hear broadcasters with diverse views, and because lack of access by a broadcaster to the airwaves impinged on First Amendment policies. There is no conflict with that case in our holding that the Commission lacks jurisdiction to impose access by the public to private cable facilities. That increased opportunities for diverse expression remain high among our society's desiderate does not confer jurisdiction to do what the Commission did here.
 
 
 [43]
 Dean Griswold's "decisional leapfrogging," though applied to the Constitution and the courts, may be applied to agencies, which may also decide that, "Well, it really is a good idea." (Here the obviously good idea of increasing opportunities to exercise freedom of speech) See Griswold, The Judicial Process, 28 Rec. of N.Y.C.B.A. 14, 25 (1973). The present rules are not designed to meet a constitutionally forbidden "abridging" of the right to speak. Nor do they involve the "balanced presentation of ideas" concept of the Fairness Doctrine. They merely attempt to create a public right to speak on cable television
 
 
 [44]
 We do not here consider, of course, whether the Congress could constitutionally so direct
 
 
 [45]
 The Commission's submission of an objectives statement in support of origination, and its submission of part of that statement here in support of free public access, is a further illustration of the unreliability of broad, malleable, agency-created, all purpose "objectives" as the sole basis for testing jurisdiction. There is no question that public access necessarily increases outlets and augments choices. The present agency rationale for requiring cable systems to build additional channels, for example, would support the jurisdiction to order a cable system built where none existed, for that would "increase outlets" and "augment choices."
 
 
 [46]
 The Commission went on to state that cable could not have the economic benefits of signal carriage without having public responsibilities as well. Cable Report, 36 F.C.C.2d at 354. The National Black Media Coalition, et al., also emphasize cable's "free" acquisition of broadcast signals which no longer obtains. See note 32 supra
 
 
 [47]
 In Fortnightly, the Court held that cable systems did not "perform" programs retransmitted and did not, therefore, have to pay royalties. 392 U.S. at 400-01, 88 S.Ct. 2084
 
 
 [48]
 The 1976 Report resulted from the realization that many equipment and construction requirements of the 1972 Cable Report had proven excessively burdensome, counterproductive, and unrealistic. A major value in a competitive, consumer-choice system lies in the limitation of losses to those entrepreneurs who, like the purveyor of the Edsel, guess wrong about consumer preferences. A major detriment resides in regulatory action requiring massive construction by an entire industry to meet an agency-envisaged future, and with no evidence of consumer demand. If the guess is wrong, everybody loses
 
 
 [49]
 Some, but only some, cable systems have already built 20 or more channels, some in response to the Cable Report. That circumstance does not create a jurisdiction in the Commission to compel public access to the facilities of any cable system
 
 
 [50]
 As discussed infra, the Commission rescinded its mandatory origination rule because, inter alia, there was no demand for such programs. In its 1976 Report, the Commission refused to consider whether any viewer demand existed for access programs, though the "access concept" and its Cable Report had been extant for years. See p. 1033 supra
 
 
 [51]
 A responsibility clearly distinguishable from that of guarding a local broadcaster's audience against cable invasion from afar, as in Southwestern, supra
 
 
 [52]
 The Act, § 1, includes as a statutory objective, the provision of an "efficient" communication service. The Commission does not explain, in its 1976 Report or in its brief here, how the construction of channels and installation of equipment that may never be used, so far as this record and the Commission's experience with mandatory origination would indicate, contributes to efficiency of cable systems or serves the public interest in achievement of this statutory objective
 
 
 [53]
 Intervenors National Black Media Coalition et al. suggest, in their brief at 46, a rule that cable owners be required to promote access, by seeking access users and advertising access programs to their subscribers, because it is otherwise "impossible to build an audience for access programs." (emphasis added)
 
 
 [54]
 Evidence of strong viewer demand would not alone confer upon the Commission a jurisdiction sufficient to authorize its 1976 Report mandatory access rules; nor, if jurisdiction were present, would such evidence warrant anything less than the most careful evaluation of First Amendment values involved in the "access concept." Evidence of user demand, i. e., of demand for the free use of another's property, while perhaps less difficult to find or generate, would appear to provide even less warrant for either a finding of jurisdiction or dismissal of the First Amendment concerns expressed at p. ----infra
 
 
 [55]
 Illustrating the problems and dangers inherent in some regulatory attempts to achieve positive goals, as distinguished from prevention of improper, injurious, or criminal conduct
 One intervenors' brief views public access as an opportunity for a minority spokesman to address members of his minority grouping. Contra, are those who find that use undesirable, as a potential splintering of society. Lapierre, supra note 5, at 120 n. 536.
 Competitive forces in radio broadcasting, with limited frequencies but without mandatory access rules, have not encouraged sameness, but have produced "specialty" stations: all news, black, classical, country, rock and underground. See Note, Filthy Words, The FCC, and the First Amendment: Regulating Broadcast Obscenity, 61 Va.L.Rev. 579, 617 (1975).
 
 
 [56]
 Cable subscribers represent only a small portion of the television viewers of America, and the 1976 Report exempts from its impact the cable systems serving some of them. The relationship of the public interest in "increasing community outlets" and "augmenting program choices and services" to free public access on cable facilities would be more apparent if the Commission "objectives" were also sought among the vast majority of television viewers to whom programs are supplied within the Commission's broadcasting jurisdiction, and if the 1976 Report regulations had not required that cable systems hold open a channel for access, even if no one desires access, and precluded the cable owner from using that channel to increase program diversity with his own or pay-cable programming. 1976 Report, 59 F.C.C.2d at 316-17. The net result of most attempts to regulate cable systems appears to have been to restrict, not augment, the number and type of programs available to cable consumers
 
 
 [57]
 Home Box Office may be interpreted as denying the Commission "regulatory tools" over cable it does not have over broadcasting, as equating government power over cable systems with that over newspapers in the context of intrusion into First Amendment rights, or as confining the Commission to regulation of cable activities having a nexus with cable's carriage of broadcast signals. Each interpretation would apply here, and each necessitates the setting aside of the 1976 Report access rules
 
 
 [58]
 In a post-hearing submission, the Commission cites Nat'l Citizens Comm. for Broadcasting v. FCC, 186 U.S.App.D.C. 102, 567 F.2d 1095. (D.C. Cir. 1977) and the indication therein that the Commission should consider whether broadcasters could satisfy their fairness doctrine obligations by voluntarily providing public access. We are at a loss to understand what bearing the cited case has on the present proceeding, which does not involve the fairness doctrine, but which does involve compelled access and an effort to impose common carrier type obligations, or to understand how, if at all, the case can be thought to have overturned the Commission's policy respecting forced access to broadcast facilities reflected in Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) or to have repealed the statutory prohibition against treating broadcasters as common carriers, pp. 1050-1051 infra
 
 
 [59]
 To the extent, if any, that "increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services" are legitimate goals achievable in broadcasting, they would appear automatically achievable with respect to those broadcast programs retransmitted by cable. The retransmitted broadcast programs have already had the benefit of Commission regulation. Where cable provides the only television service, and monopolization is a legitimate concern, a requirement that public information programs of broadcast television be retransmitted would appear to be an application of the same regulatory tool used to achieve the same public interest goals achieved within the Commission's jurisdiction over broadcasters
 
 
 [60]
 The Commission correctly says that CBS held that it need not force access on broadcasters, not that it could not do so, and that the Court referred to Commission plans to apply access to cable systems. As indicated in CBS, 412 U.S. at 113, 93 S.Ct. 2080, the Commission and the Congress have consistently recognized the serious statutory and constitutional prohibitions against enforcement of public access upon broadcast facilities. The Court in CBS did make a passing reference to proposed access rules for cable systems, but only in the course of discussing the possibility of some form of "limited" access to broadcasting at some future date, id. at 131, 93 S.Ct. 2080, and no Commission rule, access or other, was before the Court. Nor were these access rules before the court in Home Box Office, supra note 29. The Commission inappropriately argues that footnote 82 in the latter opinion shows that the D.C. Circuit "would approve an access obligation." In all events the non-dicta statements of the Court in CBS, and those in Home Box Office, are far more persuasive than passing remarks and footnotes relating to matters not before the courts. Concentrating on the latter, the Commission disregards language indicating the impropriety of its access rules, e. g., the non-public interest in access as favoring the wealthy, 412 U.S. at 123, 93 S.Ct. 2080; the difficulty of applying the Fairness Doctrine and how its suspension would lose more than gained, id. at 124, 93 S.Ct. 2080; and Congress' conclusion that "the public interest in being informed requires periodic accountability * * *," id. at 125, 93 S.Ct. at 2097
 
 
 [61]
 At this point, the Commission added a footnote: "See Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), in which the Commission's long-standing policy against such special access was upheld." The Commission did not, as it does here, refer to the Court's passing remark about the possibility of developing a "limited" form of access, though the remark related, as did CBS and the Petition, to a demand for limited access to broadcasting
 
 
 [62]
 The present rules are an effort by the Commission to exercise the "authority over activities 'ancillary' to its responsibilities greater than its authority over any broadcast licensee" referred to in the Midwest Video dissent. 406 U.S. at 681, 92 S.Ct. 1860
 
 
 [63]
 The Commission's power to license broadcasters exists only "insofar as there is demand for same * * *," 47 U.S.C. § 307(b) (1970), and the issuances of licenses is the means "to provide a fair, efficient, and equitable distribution of radio service * * *," 47 U.S.C. § 307(b) (1970). Nothing in the Act authorizes the Commission to create licensees, or to force anyone to become public access broadcasters, whether to "increase outlets" or for any other reason
 
 
 [64]
 The Commission is statutorily prohibited from censorship. 47 U.S.C. § 326 (1970). The present access rules not only impose common carrier obligations, it imposes prior censorship duties, see p. 1057 infra, on cable operators. There being no public access to broadcasting, such prior censorship duties have never been imposed on broadcasters, which the Commission is empowered to regulate directly
 
 
 [65]
 If "cablecaster" and "cablecasting" be read as "broadcaster" and "broadcasting," the access rules actually require that a cable operator become a common-carrier type broadcaster, or a broadcasting-type common carrier. In rejecting petitioner's First Amendment arguments, the 1976 Report, 59 F.C.C.2d at 299, defends the access rules as permissible, "(w)hen broadcasting, or related activity by cable television systems is involved * * * ." The Commission did not explain why, if "broadcasting * * * is involved," it did not apply its broadcast rules. Moreover, because cablecasts are sent only through the cable system's cables, and only to the system's paying subscribers, the equation of cablecasting to "broadcasting," i. e., to sending a communication out over radio frequencies for free pick-up by anyone with a receiver, appears at best tenuous
 
 
 [66]
 That Congress has recognized the giving of the microphone to everyone, even if they pay for it, is making the microphone owner a common carrier, is reflected in the quotations from legislative history quoted in CBS, supra, 412 U.S., at 105-110, 93 S.Ct. 2080
 ACLU argues that cable systems have in recent times adopted practices which it says are common carrier in nature, citing Nat'l Ass'n of Reg. Util. Comm'rs v. FCC, 174 U.S.App.D.C. 374, 533 F.2d 601 (1976), which dealt with point-to-point, two-way, nonvideo communications, not free public access to cable systems facilities. To the extent that cable systems elect to engage in or interact with common carrier activities, those activities or interactions may be subject to regulation; the problem comes when the Commission attempts to force common carrier activities. ACLU's insistence that the access rules of the 1972 Cable Report be resurrected, by essentially full common carrier regulation under Title II, with freedom to set lease rates that will attract capital, illustrates the identity of access rules and coercion of cable systems into common carrier activities.
 
 
 [67]
 "So long as the rules adopted are reasonably related to achieving objectives for which the Commission has been assigned jurisdiction we do not think they can be held beyond our authority merely by denominating them as somehow 'common carrier' in nature. The proper question * * * is * * * whether the rules adopted promote statutory objectives" 1976 Report, 59 F.C.C.2d at 299. The Commission does not tell us how or why its access rules are not far more than merely denominated as "somehow" common carrier in nature, or why they are not in fact common-carrier-type rules
 
 
 [68]
 There was no common carrier question raised in Midwest Video. The origination rule had at least the merit of compelling cable operators to do no more than what broadcasters must do, i. e., originate programs
 
 
 [69]
 That the origination rule in Midwest Video was free of the potential First Amendment problems created by mandatory access rules serves to further strengthen our conclusion that the "reasonably ancillary" standard, though it legitimized origination, cannot encompass mandatory access
 If jurisdiction existed, necessitating resolution of the constitutional issues, we would not interpret the Commission's statutory grant as permitting violation of constitutional rights. Greene v. McElroy, 360 U.S. 474, 506-508, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Kent v. Dulles, 357 U.S. 116, 125-130, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1957).
 
 
 [70]
 Communication via cable has been held to constitute protected speech, Weaver v. Jordan, 64 Cal.2d 235, 49 Cal.Rptr. 537, 411 P.2d 289, cert. denied, 385 U.S. 844, 87 S.Ct. 49, 17 L.Ed.2d 75 (1966); as have movies, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952)
 
 
 [71]
 The Commission's authority to regulate with respect to the technicalities involved in cable systems' use of microwaves was recognized by this court in Black Hills Video Corp. v. FCC, 399 F.2d 65 (8th Cir. 1968)
 
 
 [72]
 One commentator believes that access rules were the Commission's way out of "the fairness cave." Price, supra note 5, at 551-52 n.61. See note 62 supra, regarding the dilemma noted by the Court in CBS, respecting the application or waiver of the Fairness Doctrine when public access is mandated
 
 
 [73]
 The Commission's request for remand in American Civil Liberties Union v. FCC, Case No. 76-1695 (D.C.Cir.), indicating the possibility of repeal of prior censorship responsibilities, has no effect here. The Commission may elect not to repeal the rule, and repeal would not resolve other problems involved in the access rules generally. See note 19 supra
 
 
 [74]
 The Commission places the burden on the cable operator to prove that inferior equipment will harm his system's service before it will permit him to refuse installation, and requires that he permit a test installation over a reasonable time to determine whether harm will result, though it recognized that "posting bond may be appropriate" during the test period. Memorandum Opinion and Order, 62 F.C.C.2d 399, 404 (1976)
 
 
 [75]
 Midwest's standing to raise the constitutional rights of cable users has not been challenged. See Note, Standing to Arrest Constitutional Jus Tertii, 88 Harv.L.Rev. 423 (1974); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)
 
 
 [76]
 In CBS, supra, at 115, 93 S.Ct. 2080 et seq., the Court said broadcasters are not engaged in government action just because they are permitted to use the airwaves. Here the government requires cable operators to censor. The Court said the First Amendment does not reach acts of private parties in every instance in which the Commission or Congress merely permitted or failed to prohibit the speech-denying act complained of. 412 U.S. at 119, 93 S.Ct. 2080. Here the Commission has ordered such acts
 
 
 [77]
 Whether the Commission considered a requirement that all access programs be in the form of videotape, whether the cost of videotape to access users would have limited the Commission's desire to get absolutely everybody on cable television, or whether the Commission considered assigning the cost of access videotapes to the cable consumers, is unknown
 
 
 [78]
 The brief of ACLU refers to Midwest's arguments as "obsolete notions of economic due process." Those relying on regulatory power and exuberance, to deliver over the facilities of another at no cost, may rue the day. The regulatory mind is normally unbiased; the regulatory rain falls on all
 
 
 [79]
 Considering the difficulties experienced by the courts in defining the obscene, the cable operator, were he to engage a battery of lawyers, could hardly be envied this part of the tasks imposed by the regulations under review
 
 
 [80]
 The Commission also indicated in its Clarification that it planned to seek legislation making obscenity and indecency on cable channels a federal crime. 59 F.C.C.2d at 985-86. Why, if cable casting be broadcasting, such legislation is needed in view of 18 U.S.C. § 1464 (1970) was not discussed. The Commission's monumental lack of success in obtaining legislation giving it general regulatory power over cable systems bodes ill for the notion that the problem is "readily remedied by Congress."
 
 
 [81]
 For a review of the difficulties experienced by the Commission in dealing with obscenity and profanity in broadcasting, and the limited use of the criminal prohibition of 18 U.S.C. § 1464 (1970), see Note, Filthy Words, supra note 55
 
 
 [82]
 The Commission's assertion that there is no real difference between origination and access rules is not accompanied by an indication that its hopes for access will prove any less forlorn, or its crystal ball any less clouded. The Commission mentioned access rules in the course of abandoning origination, but its assertion here, that access was merely substituted as a less burdensome requirement, suffers from comparison with its actual reason for abandoning origination, as formally expressed in its Report and Order in Docket 19988, supra. The Commission does not explain how massive rebuilding and public access are "less burdensome" on cable operators than no rebuilding and control of his facilities for his own origination
 
 
 [83]
 It would appear that the logic of this approach would have justified a government requirement for building 12,000 foot runways at every major airport in 1930, or rocket launching pads in 1947, when some were predicting and urging a flight to the moon. The Commission has forbidden the laying of a seventh transatlantic cable on the ground that it may not be used. Report, Order and Third Statement of Policy and Guidelines in Docket No. 18875, FCC 77-862 (Dec. 23, 1977)
 
 
 [84]
 If jurisdiction existed, it would be necessary to consider a further issue. When the Commission first adopted its access rules, Cable Report, it compensated the affected cable systems, for the burdens imposed, with additional distant signal carriage. With no explanation, the Commission imposed access rules in the 1976 Report for the first time on other cable systems with no compensation for the burdens thereby imposed
 Concerning the compulsion of massive expenditures for cable structures that may never be used, and the cost of which is not recoverable, the 1976 Report appears to dismiss objection with a touch of the sang-froid : "when it appears, based on our experience in administering our rules, that they are unnecessarily burdensome * * *, we change them." 59 F.C.C.2d at 326.
 
 
 [85]
 The Commission devoted a paragraph, 1976 Report, P 9, 59 F.C.C.2d at 296, to recognition that "public benefits must be carefully weighed against the costs * * *," but the "weighing" related only to the more burdensome construction rules of its Cable Report, not to its access concept. The Commission stated that its 1976 rulemaking related only to alternative methods "by which it might reaffirm its commitment to access programs * * *," id. at 295; that its 1972 commitment "should not be abandoned," id. at 296; and that it had a "basic determination to retain channel capacity and access rules," id. at 297. In its Memorandum Opinion and Order, 62 F.C.C.2d 399, reconsidering its 1976 Report, the Commission stated, "There should be no mistake regarding the Commission's continuing commitment to the provision of access services and channels. However, as we stated in the Report and Order, this is a very difficult area. Our general reevaluation of the 1972 rules was not intended to reverse our position * * *." Id. at 401
 
 
 [86]
 So far as appears in the record, the Commission did not consider the possibility of Commission-designed questionnaires sent by cable operators to their subscribers and returned by the subscribers to the Commission, to determine viewer interest
 
 
 [87]
 The record of the 1976 Report is replete with comments that, though there was "awareness" of access programs, few people with something to say were interested in producing them; that almost no one wants to watch in many segments of our vast country; that when access had been tendered it had not been used and had been rejected by subscribers; that offers of access had been declined by schools which owned television equipment for its use; that a survey of 149 cable systems showed their access channels, offered under the Cable Report rules, went unused an average of 92% Of the time; that another survey of 10,000 subscribers showed 97% Disinterested in viewing access programs if they cost $1.75-$2.00 per month; that access programs had been voluntarily provided when subscriber interest warranted them. There was no evidence that ordinary market demand could never result in access programs, or that a solemn silence would descend in the absence of mandatory access rules. There was no evidence that programs of so little interest or value that no one and no group is willing to purchase time to present them would garner viewers
 Lack of evidentiary support in the record is asserted by both petitioners. ACLU points out that the Commission has not named the access-supporting groups it says it solicited for comment, or disclosed the criteria used in selecting them, and argues that the economic data reflected a much smaller burden than that used to justify the modification made to the construction requirements of the Cable Report.
 
 
 [1]
 Chief Judge Markey makes it abundantly clear that Parts II and III are not necessary to the result. See pp. at 1052, 1055, 1056, and 1057